FILED
OCTOBER 1, 2015
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| RAYMOND COOK and ARLENE COOK, husband and wife and the marital community comprised thereof, | ) ) ) ) | No. 32000-6-III |
| Appellants, | ) ) ) | |
| v. | ) ) | PUBLISHED OPINION |
| TARBERT LOGGING, INC., a Washington Corporation, and SHANE BEAN and JANE DOE BEAN, husband and wife and the marital community comprised thereof, and STEVENS COUNTY, a local governmental entity, | ) ) ) ) ) ) ) ) | |
| Respondents. | ) | |

SIDDOWAY, C.J. — The jury trial of Raymond and Arlene Cook's claims arising out of a collision between a pickup truck driven by Mr. Cook and a logging truck driven by an employee of Tarbert Logging Inc. resulted in a defense verdict in favor of Tarbert, its driver, and Stevens County. The Cooks appeal, arguing that the trial court abused its discretion in making erroneous spoliation-based rulings that excluded the testimony of their expert on the key issue of the drivers' speeds at the time of impact, allowed defense experts to testify to the drivers' speeds using the Cooks' expert's photographs and measurements, and allowed the defense to invite a negative inference from the fact that the Cooks engaged an expert whom they did not call to testify.

The trial court erred in concluding that Washington has recognized a general duty to preserve evidence; it has not. For that reason, and because only intentional spoliation logically supports an adverse inference, the trial court erred when it ruled in limine that it would admit evidence and allow defense argument in support of such an inference. The trial court also abused its discretion in ruling in limine that the defense could present evidence to support argument of what was tantamount to a missing witness inference from the Cooks' failure to call their expert witness on speed to testify at trial.

The error is reversible except as to Stevens County, which was sued for its negligent plowing of the road. Since the jury's special verdict found that the county was not negligent, any error in the evidence and argument on speed—which bore, in the county's case, only on comparative fault—was harmless as to the county.

We affirm the judgment in favor of Stevens County, reverse the judgment in favor of Tarbert and its driver, and remand for a new trial.

## FACTS AND PROCEDURAL BACKGROUND

For the judges on this panel and many participants in the trial below, this case brought to our attention for the first time the existence of event data recorders in modern cars and trucks that not only continually monitor data about a vehicle's operation but also can retain data about its operation in the seconds before a crash. In this case, the event data recorder was an airbag control monitor (ACM) in Raymond Cook's 2006 GMC Sierra pickup truck.

2

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

As explained by the experts who testified at trial, the airbag icon that lights up on the dashboard during a vehicle's operation indicates that the ACM is working, streaming data about the key aspects of the vehicle's operation that inform whether to trigger the explosion that will deploy airbags. Among operating information continually being streamed through an ACM are the vehicle's speed, the engine's speed, the percent throttle, the brake switch circuit status, and the driver's seat belt status. An ACM is programmed with an algorithm that determines within milliseconds whether the operating information collectively signals a crash, in which case airbags will be deployed. After deployment, the ACM retains information that was streaming through it for up to five seconds "before algorithm enable." Clerk's Papers (CP) at 14. If the vehicle is one for which software and hardware for reading retained data is available to the public, then according to experts in the trial below, the data is "very useful" in determining precrash speed. Report of Proceedings (RP) (Aug. 27, 2013) at 1207.[1]

In this case, Mr. Cook's pickup truck collided with a Tarbert logging truck being driven by Shane Bean on a primitive road[2] in Stevens County one morning in February

---

[1] We note that there is overlapping numbering in some of the reports of proceedings.

[2] "Primitive roads" are roads that are not classified as part of a county primary road system, have a gravel or earth driving surface, and have an average daily traffic of 100 or fewer vehicles. RCW 36.75.300. By statute, counties are relieved of certain road design, signage, and maintenance standards with respect to primitive roads. *Id.*

3

2009. It is undisputed that the accident occurred on a particularly narrow stretch of the road on a blind curve, and that packed snow and ice on the road was very slippery that morning.

Mr. Cook was badly injured in the accident, and his pickup truck was totaled. He retained a lawyer to explore the possibility of legal action. By March 17, 2009, American Forest Casualty Insurance Company, which insured Tarbert, had received a letter from Mr. Cook's lawyer F. Dayle Andersen providing notice of a claim. A claims administrator for the insurer acknowledged the claim on March 18 and stated that a liability investigation was underway.

At the time, the GMC truck—which was registered in the name of Mr. Cook's sister, Gina Cook, and was owned by her limited liability company—was being stored in a shed belonging to Mr. Cook's son, Joshua.[3] Mr. Andersen told Joshua to maintain the vehicle as it was and to keep it indoors until further notice. On March 25, 2009, Mr. Cook and Mr. Andersen traveled to the shed with Dr. Richard Gill, a mechanical engineer and human factors specialist retained on Mr. Cook's behalf by Mr. Andersen, to inspect the truck. Dr. Gill took crush measurements and photographs.

Dr. Gill did not remove the ACM from the truck or download any data from it. When later deposed, he testified that he was familiar with event data recorders such as the

_____

[3] We refer to Joshua by his first name to avoid confusion with his father. We mean no disrespect.

4

ACM and with "the improvements that have been made over time with them[,] . . . the variability in terms of the types of data that's recorded[, and] . . . the limitations of them," but that he was not qualified to download their data. CP at 284. He testified that he had become more familiar with them between 2009 and the 2012 date of his deposition, but that he had worked on cases even before March 2009 in which one of the experts had downloaded data from an event data recorder. He testified that while he was not qualified to download such data, he "certainly considered it both pro and con" when the data had been downloaded by someone else. *Id.*

In February 2010, Mr. Andersen served Stevens County with the statutorily required presuit notice that the Cooks asserted a tort claim against the county for negligent plowing of the road. *See* RCW 4.96.020. The Cooks contended that the county had failed to plow a swath through the snow and ice that was as wide as the roadway, leaving the plowed roadbed too narrow for the traffic for which the road was designed.

The county did not acknowledge liability in response to the statutory notice, and in December 2010 Mr. Cook filed his complaint for negligence against Tarbert, Mr. Bean, and Stevens County. [4]

---

[4] Tarbert's counsel represented Mr. Bean at trial. For simplicity, we will refer to Tarbert and Mr. Bean collectively as "Tarbert" in discussing their participation in the litigation.

Stevens County initially defended with a motion for summary judgment, evidently based on the "primitive" status of the road on which the accident occurred. After that motion was denied, the county asked the Cooks for the opportunity to examine the GMC pickup truck, through electronic mail sent by the county's lawyer in February 2012.

By the time of the county's request, the pickup truck had been "parted out" and sold. In a deposition later taken of Joshua, he testified that he could not recall precisely when he sought permission from Mr. Andersen to get rid of the truck. He provided two inconsistent answers that were never clarified. Based on those inconsistent answers, his parting out and selling of the truck took place either during a one-year period that began in the winter of 2009-10 or during a one-year period that began in August or September 2010.

Dr. Gill prepared a written report in September 2012 that included his opinion that Mr. Cook was traveling at a slower and safer speed than Mr. Bean at the time of the accident. Accusing the Cooks of spoliation, Stevens County filed a motion asking the trial court to preclude Dr. Gill from offering opinion testimony about Mr. Cook's speed before and at the time of the collision and to instruct the jury that the parting out of the pickup mandated an inference that the evidence, had it been preserved, would have been unfavorable to the Cooks' position. Tarbert joined in Stevens County's motion.

In support of the spoliation motion, Stevens County and Tarbert contended that Mr. Cook's lawyer gave Joshua permission to part out the truck and sell it for no good

reason, aware that the defendants would probably want to examine it. They also contended that Dr. Gill's awareness of the ACM as a source of valuable information on speed should be imputed to the Cooks and their lawyer.

The Cooks argued that they retained the pickup for years, that neither defendant sent them a litigation hold or otherwise indicated interest in examining the pickup during the years it was retained, and that the defendants had not identified any duty on the part of Mr. Cook to retain it. They also argued that the ACM was not as critical as claimed by the defendants, since one defense expert had already prepared a report expressing defense-favorable opinions on the drivers' speeds based on other available evidence.[5]

The court concluded that the Cooks had a duty to retain the pickup truck, explaining in its oral ruling that the duty arose because Dr. Gill had the opportunity to examine the truck and "[i]t would likely be a quick jump to recognize that on down the line at some point the . . . defense might want to have the opportunity to have an examination independently conducted of the vehicle and more specifically as to the [ACM]." RP (Feb. 8 & Aug. 19, 2013) at 33-34. It found no duty on the part of the

_____

[5] Mr. Cook also argued below and argues on appeal that the truck belonged to his sister's company, not to him. As pointed out by the defense, Mr. Cook was the president of his sister's company, the truck was assigned to him, and he described it as "my truck." RP (Aug. 26, 2013) at 971-72. Even more importantly, after the collision, family members relied in all of their postaccident dealings with the totaled truck on Mr. Andersen's directions. Substantial evidence supported the trial court's implicit conclusion that the Cooks and their lawyer had sufficient control over the totaled truck to bear responsibility for the disposal. We do not consider this argument further.

7

defendants "to demand access instantly to the item." RP (Feb. 8 & Aug. 19, 2013) at 34. While the court stated it did not find any purposeful intentional destruction, "common sense should have caused the parties on the plaintiff side to say, this item needs to be preserved and there needs to be some notice to the other side." *Id.* It granted the defendants' motion to exclude Dr. Gill's opinions on the drivers' speed at the time of the collision. Opinions Dr. Gill had expressed on other matters were not excluded.

The findings, conclusions, and order later entered by the court included its determination that "[p]laintiffs did not act in bad faith or with deliberate intention to destroy the evidence" and its conclusion that they were nonetheless culpable for violating a duty to preserve the evidence because they were "aware of its importance and relevance." CP at 123. The court reserved ruling on whether it would give a spoliation instruction to the jury.

Among matters considered at a pretrial hearing on August 19, 2013, and revisited during trial were two spoliation instructions proposed by the defense and a request by Tarbert and Stevens County that they be allowed to question Mr. Cook not only about disposing of the truck but also about retaining Dr. Gill and Dr. Gill's examination of the truck. Mr. Cook had cross moved for an order in limine precluding any mention of Dr. Gill, whom the Cooks decided not to call as a witness.

8

On August 19, Mr. Andersen explained his concern about the defendants' request

to tell the jury that an expert (who would not appear at trial) had been hired by the Cooks

and was the only expert who had examined the truck before it was parted out:

> [M]y biggest problem is, Your Honor, what basically defendants are trying
> to do is create an inference that Dr. Gill's opinions were bad, because we
> can't address the nature of his opinions. I can't say: Well, he was going to
> say that Tarbert and Stevens County were at fault, because those opinions
> have been excluded. So then to sit there and say plaintiffs had an expert,
> where is he, where's the truck? . . .
>
> There's going to be an inference that he created a negative opinion
> about the case. I don't know how you remove that by saying this
> gentleman examined the truck, the truck was destroyed, and now Mr. Gill is
> not here to testify about it. Even if they don't say Mr. Gill is not here to
> testify about it, the jury is going to recognize that this person who examined
> the truck never testified. So basically it's highlighting the testimony of a
> witness who wasn't called, whose opinions have been excluded under order
> of limine, and who I'm prohibited from addressing whatsoever because of
> the order in limine.

RP (Feb. 8 & Aug. 19, 2013) at 68. The trial court reserved ruling on whether the

defense would be allowed to question Mr. Cook about his engagement of an expert,

stating that it would be revisited before the conclusion of Mr. Cook's testimony.

That issue and the issue of whether a spoliation instruction would be given were

revisited on August 22, at which point Mr. Andersen proposed what he "hop[ed would]

be a resolution" by stating he would not object to the defense examining Mr. Cook about

the fact that the truck was parted out before the lawsuit was filed and before the defense

had an opportunity to inspect it. RP (Aug. 22, 2013) at 762. He conceded the jurors

9

might draw an adverse inference on their own. Mr. Andersen's "main difficulty," in the parlance of the court, was with the giving of a spoliation instruction and any mention of Dr. Gill. RP (Aug. 22, 2013) at 763.[6]

The trial court gave extensive consideration to whether to instruct on spoliation and ultimately decided not to. It concluding that it was sufficient that Dr. Gill's testimony was excluded and the defense would be free to elicit testimony from parties concerning the existence of the ACM, the authorization of its disposal by agents of the plaintiff, and the fact that the defense never had the chance to examine it. Mr. Andersen acknowledged this to be a "fair resolution." RP (Aug. 22, 2013) at 773.

But then, the following exchange occurred:

> [STEVENS COUNTY'S LAWYER]: Point of clarification, Your Honor.
> THE COURT: Yes, sir.
> [STEVENS COUNTY'S LAWYER]: May we establish that an expert hired by the plaintiff examined the vehicle before the vehicle was --
> THE COURT: Yes.
> [STEVENS COUNTY'S LAWYER]: -- parted off? Thank you.
> THE COURT: Any other questions on that, Counsel?
> MR. ANDERSEN: I have a question, Your Honor. If, in fact, they can establish it, then I would think the plaintiff would have the right to

---

[6] Stevens County argues that with this proposal, Mr. Andersen created invited error. Br. of Resp't Stevens County at 28. But as discussed in the analysis section below, the Cooks' assignments of error are to the threshold finding of spoliation and to the court's in limine rulings permitting evidence and argument suggesting what amounted to a "missing witness" inference. The Cooks preserved error in the spoliation finding, and it was not invited error for Mr. Andersen to try to persuade the court to impose what he considered to be the least harmful consequences to his clients.

10

indicate to the jury that the expert's opinions were not negative towards Mr. Cook. Because the --

. . . .

. . . [b]ecause if the parties are allowed to say the plaintiff hired an expert to inspect this vehicle, the jury is going to say, well, where is this expert[?] So, there's clearly going to be some negative inference derived from the plaintiff to indicate that the expert is going to have a negative opinion against the plaintiff.

THE COURT: I would disagree with that. I've already made the ruling on Mr. Gill, and there won't be any reference to Mr. Gill apart from the fact that there was an expert who evaluated the vehicle at the instance of the plaintiff.

RP (Aug. 22, 2013) at 773-74.

Relying on the trial court's ruling, both defense lawyers established through cross-examination of Mr. Cook that an expert for the Cooks had examined the truck and taken measurements on the Cooks' behalf at a time when they knew they were going to bring a lawsuit. Anticipating the examination, Mr. Andersen even touched in direct examination on the fact that "someone" had looked at the truck after the collision and had taken measurements. RP (Aug. 26, 2013) at 1023. Mr. Cook's testimony established that a couple of years after the accident, Joshua had sold the truck by parting it out.

In closing argument, Tarbert's lawyer argued:

Also, we learned, going chronologically, something else happened in March of 2009. Josh Cook was storing this truck and an expert came out and took photos and measurements, an expert who didn't download the data from that airbag control module that would have told you exactly how fast Ray Cook was going in the five seconds leading up to the impact. The lawsuit was later filed in December of 2010, and the Cook family disposed of the pickup, parted it out, sold it off, before either of the defense experts were able to access it and download that airbag control module data.

11

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

RP (Aug. 28, 2013) at 1308.

In his closing argument, Stevens County's lawyer mentioned the testimony of the defense experts that Mr. Cook had been driving too fast, and then told the jury:

> And contrary to that, plaintiff hasn't called an expert to tell you what caused this accident. Plaintiffs called Mr. Keep to tell you how the road should be plowed, but there's not one bit of expert testimony from anyone in this trial to suggest that the accident was caused by anything other than Mr. Cook's speed.
>
> Now, you have heard some testimony about an expert witness, and Ms. Bloomfield went over this and I'm not going to belabor the point, but in March of 2009 you heard that Mr. Cook had an expert examine his vehicle. You heard that Mr. Cook, in March of 2009, knowing that he was going to bring a lawsuit, had the expert photograph his vehicle and take measurements of the crush depth of his vehicle. And you recall I asked Mr. Hunter, I said, Why would an expert take measurements of the crush depth? And he told you that's how experts determine speed upon impact.
>
> You also heard that Mr. Cook's vehicle was equipped with an airbag control module when the expert reviewed or looked at that truck back in March of 2009. You heard that that airbag control module would have told us exactly how fast Mr. Cook was going the five seconds before this collision and at the point of impact. But unfortunately, as you also heard, that truck, after plaintiff's expert examined it, was disposed of. It was parted off and sold, so the defense experts didn't have the opportunity to look at that airbag control module. When you go to the jury room to deliberate, you can take whatever inference you want from Mr. Cook's actions in having an expert examine that vehicle and then sell that vehicle.

RP (Aug. 28, 2013) at 1331-32.

The jury returned a defense verdict. The Cooks appeal.

12

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

ANALYSIS

The Cooks contend that the trial court erred or abused its discretion at three stages in addressing the spoliation issue. They argue first, that the court abused its discretion when it assumed, in error, that the Cooks had a duty to preserve the evidence and found spoliation as a result; second, that it abused its discretion by allowing the defendants to present evidence about a nontestifying witness, creating an adverse implication from his absence; and third, that it abused its discretion and compounded the harm when it refused to allow the Cooks to rebut the false inference by demonstrating that their expert's opinions would have supported their claim. Both defendants deny any error or abuse of discretion but argue that if one occurred, it was harmless.

Whether a duty to preserve evidence exists is a question of law. We review questions of law de novo. *Sunnyside Valley Irrig. Dist. v. Dickie*, 149 Wn.2d 873, 880, 73 P.3d 369 (2003). We review a trial court's decision imposing sanctions for spoliation for abuse of discretion. *Homeworks Constr., Inc. v. Wells*, 133 Wn. App. 892, 898, 138 P.3d 654 (2006). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *Teter v. Deck*, 174 Wn.2d 207, 215, 274 P.3d 336 (2012). Untenable reasons include errors of law. *Estate of Treadwell v. Wright*, 115 Wn. App. 238, 251, 61 P.3d 1214 (2003).

We first address the Cooks' arguments in the order stated, and finding error, we then address whether it was harmless.

13

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

*I. The spoliation finding and sanctions*

Did the Cooks commit sanctionable spoliation?

*Washington cases have not recognized a general duty to
preserve evidence*

In *Henderson v. Tyrrell*, this court cited the definition of spoliation as "'[t]he intentional destruction of evidence'" but at the same time observed that jurisdictions modernly treat the term as "encompass[ing] a broad range of acts." 80 Wn. App. 592, 605, 910 P.2d 522 (1996) (quoting BLACK'S LAW DICTIONARY 1401 (6th ed. 1990)). Adopting an approach for determining when spoliation is sanctionable from an Alaska case, *Sweet v. Sisters of Providence in Washington*, 895 P.2d 484 (Alaska 1995),[7] *Henderson* held that the "severity of a particular act (in terms of the relevance or importance of the missing evidence or of the culpability of the actor) determines the appropriate remedy." 80 Wn. App. at 605. Its subsequent discussion of culpability illuminates the "range of acts" the court recognized as spoliation.

---

[7] *Henderson* adopted only *Sweet*'s approach to determining a sanction; it explicitly refused to reach *Sweet*'s identification of a rebuttable presumption as an appropriate remedy. 80 Wn. App. at 612 n.8. Washington courts have preferred instructing a jury on a permissible inference rather than a presumption in the analogous context of missing witnesses. *Wright v. Safeway Stores, Inc.*, 7 Wn.2d 341, 345-46, 109 P.2d 542 (1941); *State v. Davis*, 73 Wn.2d 271, 281, 438 P.2d 185 (1968), *overruled on other grounds by State v. Abdulle*, 174 Wn.2d 411, 275 P.3d 1113 (2012). The issue is not presented in this appeal, but we note our disagreement with the suggestion in *Marshall v. Bally's Pacwest, Inc.*, 94 Wn. App. 372, 381, 972 P.2d 475 (1999) that *Henderson* approved a rebuttable presumption as a remedy for spoliation.

14

The culpable conduct relied on in seeking a sanction must be connected to the party against whom a sanction is sought. *Id.* at 606. In *Henderson*, the court applied the "connection" requirement as meaning that the act of destruction was by someone over whom the potentially sanctioned party had some control. And in *Henderson*, the court charged the plaintiff with his lawyer's knowledge that the defense had requested that evidence be preserved. *Id.* at 611.

In weighing the importance of the destroyed evidence, the fact that the culpable party itself investigated the evidence is relevant but not determinative. *See id.* at 607-09. Whether destruction of the evidence gave the culpable party an investigative advantage is a consideration; conversely, the fact that neither party presents the testimony of an expert who examined the evidence before its destruction diminishes its importance. *Id.* at 607-08. In *Henderson*, in which a car involved in a one-car accident was destroyed, the "many photographs available to the experts" supported the court's decision that no sanction was appropriate. *Id.* at 609.

In considering culpability, courts examine whether the party acted in bad faith or with conscious disregard of the importance of the evidence, or whether there was some innocent explanation for the destruction. *Id.* "Another important consideration is whether the actor violated a duty to preserve the evidence." *Id.* at 610. In *Henderson*, the plaintiff's duty to preserve his car arose from an explicit request by the defendant to preserve it. Even the violation of the duty to preserve was excused in *Henderson*,

15

however, because the defendant had almost two years before the car was destroyed, which the court characterized as "ample opportunity" to examine it. *Id.* at 611.

In *Homeworks*, Division Two of our court observed that Washington cases had so far not held that a potential litigant owes a general duty to preserve evidence but it allowed that the appellants in the case "may be correct that a party has [such a duty] on the eve of litigation." 133 Wn. App. at 901. In two relatively recent cases, our court has found that no duty to preserve evidence arises where a person has been injured by an arguably negligent act and a lawsuit is a possibility. In *Ripley v. Lanzer*, 152 Wn. App. 296, 215 P.3d 1020 (2009), the trial court refused to impose a sanction against medical providers who threw away a defective scalpel handle, knowing that it had been the cause of a broken blade that lodged in a patient's knee. Our court concluded that the evidence might not have been important and "we see no bad faith or other reason to show that this act was intended to destroy important evidence." *Id.* at 326. In *Tavai v. Walmart Stores, Inc.*, 176 Wn. App. 122, 136, 307 P.3d 811 (2013), in which the plaintiff sought an adverse inference instruction against a retailer that destroyed surveillance video that might have recorded when and how water came to be on the floor where she fell, our court "decline[d] to require store premises to retain all video anytime someone slips and falls and files an accident report."

Stevens County suggests that *Henderson* recognized a general duty to preserve evidence by "quot[ing] with approval" the discussion of such a duty in *Fire Insurance*

16

*Exchange v. Zenith Radio Corp.*, 103 Nev. 648, 747 P.2d 911 (1987). Br. of Resp't Stevens County at 21. But *Henderson* did not quote the language in discussing the existence of a general duty. Rather, in a footnote in which the court explained why an explicit request to preserve evidence can give rise to a duty even if made before a lawsuit is filed, *Henderson* cites *Zenith Radio* as supporting the proposition that "a party's disregard of an opposing party's informal request could be viewed as an indication of bad faith." 80 Wn. App. at 611 n.7. The language that Stevens County characterizes *Henderson* as "approving" is merely parenthetically included as support for this different proposition.

Read as a whole, *Henderson*'s discussion of culpability as a factor implicitly holds that a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation. The discussion of the defendant's culpability begins with the observation that many courts examine "whether the party acted in bad faith or conscious disregard of the importance of the evidence." *Id.* at 609. Negligence is not mentioned.

*Henderson* then turns to a discussion of violation of a duty as a form of culpability, but the examples it gives are all of legal duties unrelated to foreseeable litigation. As observed by the court in *Homeworks*, "Significantly, in *Henderson*, the court did not suggest that potential plaintiffs have a general duty to preserve all evidence. Instead, the *Henderson* court looked to other sources for duty such as the duty of a

17

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

partner to preserve records or the duty of a medical provider to save medical information." 133 Wn. App. at 901.

Having identified those sorts of sources for duty, *Henderson* states, "Here, the Hendersons have not established . . . any similar duty to retain the 1972 Camaro." 80 Wn. App. at 610. There is no way to read that statement other than as the rejection of a general duty to preserve evidence. The court's consideration of spoliation continued in *Henderson* only because the Hendersons could point to their lawyer's letter to the defendant's lawyer explicitly asking that the car be preserved until further notice. The defense did not make a request that evidence be preserved here.

*While defendants cite federal cases that recognize a general duty to preserve evidence, federal law does not help them*

"Washington case law on spoliation is sparse." *Homeworks*, 133 Wn. App. at 898. In outlining a framework for identifying spoliation and framing a sanction, *Henderson* looked to contemporary cases from other jurisdictions, evidence treatises, and law review articles. In the 19 years since *Henderson* was decided, the federal courts and some state courts have recognized a general duty to preserve important evidence. Both Tarbert and Stevens County cite to federal decisions postdating *Henderson* as additional support for the court's findings and sanctions here, suggesting that we should follow the federal trend. Br. of Resp't Tarbert at 26 (citing *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368-70 (9th Cir. 1992)); Br. of Resp't Stevens County at 21

18

(citing *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212 (S.D.N.Y. 2003)). The federal

cases do not support the trial court's rulings, however—or at least do not support its in

limine ruling permitting the defendants to present evidence and argument of an adverse

inference.

In *Zubulake*, the case cited by Stevens County, the court held that the party

seeking instruction on an adverse inference for merely negligent spoliation must show

that the destroyed evidence was "relevant" in a heightened sense: it must adduce

sufficient evidence that a reasonable trier of fact could infer that the evidence *would*

have—not *might* have—been helpful to its case. As the federal court explained:

> [I]n order to receive an adverse inference instruction, Zubulake must
> demonstrate not only that UBS destroyed relevant evidence as that term is
> ordinarily understood, but also that the destroyed evidence would have
> been favorable to her. This corroboration requirement is even more
> necessary where the destruction was merely negligent, since in those cases
> it cannot be inferred from the conduct of the spoliator that the evidence
> would even have been harmful to him. This is equally true in cases of gross
> negligence or recklessness; *only in the case of willful spoliation is the
> spoliator's mental culpability itself evidence of the relevance of the
> documents destroyed.*

220 F.R.D. at 221 (some emphasis added) (footnotes omitted) (quoting *Turner v. Hudson

Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991)); *accord Orbit One Commc'ns,

Inc. v. Numerex Corp.*, 271 F.R.D. 429, 439-40 (S.D.N.Y. 2010); *cf. Reinsdorf v.

Skechers U.S.A., Inc.*, 296 F.R.D. 604, 627 (C.D. Cal. 2013) (while the Ninth Circuit

Court of Appeals has not clearly articulated the degree of culpability necessary to warrant

19

an adverse inference instruction, courts in the circuit have found willfulness or gross

negligence to suffice).[8]

In addition to recognizing that negligence does not logically support an adverse

inference, the court observed in *Zubulake* that "[i]n practice, an adverse inference

instruction often ends litigation—it is too difficult a hurdle for the spoliator to overcome.

. . . When a jury is instructed that it may 'infer that the party who destroyed potentially

relevant evidence did so out of a realization that the [evidence was] unfavorable,' the

party suffering this instruction will be hard-pressed to prevail on the merits." 220 F.R.D.

at 219-20 (third alteration in original) (internal quotation marks omitted) (quoting *Linnen*

---

[8]In reexamining its approach to spoliation in 2014, the Texas Supreme Court observed that its position that an adverse inference sanction is available only for intentional, bad faith spoliation "aligns with a majority of the federal courts of appeals." *Brookshire Bros. v. Aldridge*, 438 S.W.3d 9, 24 (Tex. 2014) (citing cases). As a further reason weighing against giving such an instruction, the Texas Supreme Court expressed concern about distracting jurors from the historical evidence:

> [T]he imposition of a severe spoliation sanction, such as a spoliation jury instruction, can shift the focus of the case from the merits of the lawsuit to the improper conduct that was allegedly committed by one of the parties during the course of the litigation process. The problem is magnified when evidence regarding the spoliating conduct is presented to a jury. Like the spoliating conduct itself, this shift can unfairly skew a jury verdict, resulting in a judgment that is based not on the facts of the case, but on the conduct of the parties during or in anticipation of litigation.

*Id.* at 13-14.

No. 32000-6-III
*Cook v. Tarbert Logging, Inc. et al.*

*v. A.H. Robins Co.*, No. 97-2307, 1999 WL 462015, at *11 (Mass. Super. Ct. June 16, 1999) (court order)).

The most recent federal development is recently approved amendments to the Federal Rules of Civil Procedure relating to electronically stored information that permit a court to give an adverse inference instruction only if it finds intentional destruction and prejudice. Proposed Amendments to the Federal Rules of Civil Procedure, 305 F.R.D. 457, 485-86 (2015).[9] Amended Federal Rule of Civil Procedure 37(e), which will take effect on December 1, 2015, absent legislation to reject, modify, or defer the rules, reads in its entirety:

> **Failure to Preserve Electronically Stored Information.** If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>
> **(1)** upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>
> **(2)** only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>
> > **(A)** presume that the lost information was unfavorable to the party;
> >
> > **(B)** instruct the jury that it may or must presume the information was unfavorable to the party; or
> >
> > **(C)** dismiss the action or enter a default judgment.

---

[9] Also available at http://www.supremecourt.gov/orders/courtorders/frcv15(update)_1823.pdf.

21

Comments to the 2015 proposed amendments, approved by the Judicial

Conference of the United States at its September 2014 session, recognize that "[m]any

court decisions hold that potential litigants have a duty to preserve relevant information

when litigation is reasonably foreseeable" and base regulation of sanctions on the

existence of a federal common law duty. Proposed Amendments to the Federal Rules of

Civil Procedure, Rule 37 committee note, 305 F.R.D. at 570.[10]  The comments explain

that in creating a uniform standard for imposing severe sanctions when addressing a

failure to preserve electronically stored information, the intent was to reject federal

decisions that, under some circumstances, authorize the giving of adverse inference

instructions based on a finding of negligence or gross negligence. *Id.* at 575-76. The

comments offer the following explanation:

> Adverse-inference instructions were developed on the premise that a
> party's intentional loss or destruction of evidence to prevent its use in
> litigation gives rise to a reasonable inference that the evidence was
> unfavorable to the party responsible for loss or destruction of the evidence.
> Negligent or even grossly negligent behavior does not logically support that
> inference. Information lost through negligence may have been favorable to
> either party, including the party that lost it, and inferring that it was
> unfavorable to that party may tip the balance at trial in ways the lost
> information never would have. The better rule for the negligent or grossly
> negligent loss of electronically stored information is to preserve a broad
> range of measures to cure prejudice caused by its loss, but to limit the most
> severe measures to instances of intentional loss or destruction.

---

[10] Also available at http://www.uscourts.gov/rules-policies/archives/committee-reports/reports-judicial-conference-september-2014 (last visited Sept. 4, 2015).

22

*Id.* at 576.

Federal cases view a federal common law duty to preserve evidence as well established. *See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 466 (S.D.N.Y. 2010) ("The common law duty to preserve evidence relevant to litigation is well recognized.") (abrogated on other grounds by *Chin v. Port Auth. of N.Y.*, 685 F.3d 135 (2d Cir. 2012)); Joshua M. Koppel, *Federal Common Law and the Courts' Regulation of Pre-Litigation Preservation*, 1 STAN. J. OF COMPLEX LITIG. 101 (2012) (identifying sources of authority for a federal common law duty to preserve evidence); Proposed Amendments to the Federal Rules of Civil Procedure, Rule 37 committee note, 305 F.R.D. at 569-78.

There is no such uniformity in the states' views of their common law. Most states have refused to identify a tort duty to preserve evidence whose breach will support an action for damages. *See, e.g.*, Benjamin J. Vernia, Annotation, *Negligent Spoliation of Evidence, Interfering with Prospective Civil Action, as Actionable*, 101 A.L.R. 5th 61 (collecting cases); *id.* §2[a] ("The majority of jurisdictions considering the actionability of negligent spoliation . . . have not recognized the tort, either for parties or nonparties to the underlying dispute." (citations omitted)); *Metlife Auto & Home v. Joe Basil Chevrolet, Inc.*, 303 A.D.2d 30, 753 N.Y.S.2d 272, 276 (2002) ("The great weight of authority runs against recognizing a common-law duty to preserve evidence or a cause of

23

action for spoliation of evidence/impairment of claim or defense under almost any circumstances." (collecting cases), *aff'd*, 1 N.Y.3d 478, 807 N.E.2d 865, 775 N.Y.S.2d 754 (2004). The federal courts have been able to avoid dealing with state substantive law in making spoliation rulings in diversity cases by viewing such rulings as evidentiary in nature and thereby not subject to the *Erie* doctrine.[11] *See Adkins v. Wolever*, 554 F.3d 650, 652 (6th Cir. 2009); *Sherman v. Rinchem Co.*, 687 F.3d 996 (8th Cir. 2012).

Even if we were to consider the federal cases cited by Stevens County and Tarbert as supporting a trend toward recognizing a duty to preserve evidence, *Henderson* would compel us to follow their companion holdings that the merely negligent destruction of evidence cannot support an adverse inference. As *Henderson* recognized, "[U]nless there was bad faith, there is no basis for 'the inference of consciousness of a weak cause,'" which is "the evidentiary inference that spoliation creates." 80 Wn. App. at 609 (quoting 2 MCCORMICK ON EVIDENCE § 265, at 191 (John William Strong ed., 4th ed. 1992). Since the Cooks' parting out of the pickup truck did not support an adverse inference, the trial court abused its discretion when it ruled in limine that the defendants could present evidence and argument suggesting such an inference.

Given developments in the federal courts and elsewhere, it might be time for Washington to reexamine whether it should recognize the existence of a general duty to

---

[11] *Erie R.R. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).

preserve evidence. But a request for such reexamination should address many issues that the parties here did not view as presented and therefore did not brief. Those issues include (1) the source of the duty, (2) if it is proposed to be found in the exercise of the court's inherent authority, the admonition that "[b]ecause inherent powers are shielded from direct democratic controls, they must be exercised with restraint and discretion," *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S. Ct. 2455, 65 L. Ed. 2d 488 (1980), and (3) whether it is better to leave the recognition of any such duty to rule making. We will not reexamine the duty issue further where the parties have not briefed such issues.

In summary, *Henderson* did not recognize a general duty to preserve evidence. We need not consider whether federal authority offered by Tarbert and Stevens County is persuasive support for finding a general duty to preserve evidence because the federal cases, like *Henderson*, would not support the suggestion of an adverse inference absent bad faith or, at a minimum, gross negligence. In light of the Cooks' merely negligent actions, it is clear that the trial court abused its discretion in permitting evidence and argument suggesting the inference.

> *II. Did the trial court abuse its discretion in admitting evidence about the plaintiffs' absent expert and denying the Cooks' request to offer rebuttal evidence that the expert's opinions would have supported their position?*

The Cooks' most fervent objection to the trial court's spoliation rulings was to its decision to allow the jury to learn about their early retention of an expert on speed whom

25

they had not called as a witness. In briefing the parties' cross motions in limine on this issue, Tarbert explained its reasons for wanting the jury to know about the expert:

> Defendants should be allowed to show that this was not an "innocent" mistake, but that Plaintiff and his lawyer hired an expert to examine the vehicle for purposes of assessing the speed of the collision, but the expert, Plaintiffs and their attorney failed to preserve this critical evidence.
>
> . . . .
>
> It is abundantly clear that Dr. Gill knew of the importance of the black box and its data . . . . The fact that Plaintiffs and their attorney did not ensure that this information was preserved is something the jury needs to be informed of in assessing what weight to give the presumption.

CP at 283-85.

Stevens County's objective was reflected in its proposed spoliation instruction. While its proposed instruction was not given, it illustrates what the county intended to demonstrate to jurors. The instruction would have informed the jury, in part:

> Shortly after the accident, Mr. Cook hired an expert witness to examine the vehicle and render an opinion regarding the cause of the accident, including the speed involved in the collision. Mr. Cook's vehicle contained a "black box" which recorded the speed of Mr. Cook's vehicle at the time of the accident. However, the expert witness, although aware that the "black box" could provide the speed of Mr. Cook's vehicle immediately prior to impact, did not check the black box to determine the speed of Mr. Cook's vehicle. After Mr. Cook's expert witness examined the vehicle, and before the defense was allowed to examine the vehicle, Mr. Cook allowed the vehicle to be destroyed.

CP at 337.

As Mr. Andersen explained in response, he was less concerned about evidence of the pickup truck's destruction than he was about disclosure of the existence of a

26

nontestifying expert for the plaintiff, which he argued would be "highly prejudicial at this point, specifically given the fact that the court has made a finding of no bad faith." RP (Aug. 22, 2013) at 764. Mr. Andersen argued that if the jury learned that an expert for the Cooks had examined the truck, "the jury is going to say, well, where is this expert[? T]here's clearly going to be some negative inference . . . that the expert is going to have a negative opinion against the plaintiff." RP (Aug. 22, 2013) at 773. Mr. Andersen finally asked, after the court ruled that the evidence and argument would be permitted, whether his client would "have the right to indicate to the jury that the expert's opinions were not negative towards Mr. Cook." *Id.* Under the circumstances, as the Cooks recognized, the evidence and argument the defense was asking court permission to advance would be tantamount to a "missing witness" argument as to Dr. Gill. The Cooks' request to rebut the implication was denied.

It is the general rule that failure to call a witness under a party's control who could testify to material facts justifies an inference that the witness would have testified adversely to the party. *Wright*, 7 Wn.2d at 346. A jury may draw such an inference only when under all the circumstances of the case the failure to produce the witness, unexplained, creates a suspicion that the failure to produce was a willful attempt to withhold competent testimony. *State v. Baker*, 56 Wn.2d 846, 850-60, 355 P.2d 806 (1960) (citing *Wright*). While Tarbert and Stevens County were offering different reasons for presenting evidence that the Cooks had retained an expert who examined the

truck, a simple fact remains: if jurors were informed that the Cooks had retained an expert on crash speed, the expert had performed an examination, and the Cooks did not call him to testify, the inference that the law of evidence would expect jurors to draw is that the expert's testimony would not have been helpful to the Cooks. *Price v. United States*, 531 A.2d 984, 993 (D.C. 1987) ("By pointing out a witness' absence, counsel is plainly suggesting that if that witness were produced the resulting testimony would be adverse to the other party."); *In re Gonzalez*, 409 S.C. 621, 763 S.E.2d 210, 218 (2014) (prejudice from missing witness inference arose as soon as the existence of a nontestifying expert came out in cross-examination; any harm when inference was argued in closing was merely cumulative). Yet as the lawyers and the court knew, Dr. Gill's testimony would have been favorable, not adverse, to the Cooks.

The error was compounded when the court refused to allow the Cooks to rebut the inference. "A permissive inference is subject to reasonable rebuttal." *Stevenson v. Union Pac. R.R.*, 354 F.3d 739, 750 (8th Cir. 2004); *Webb v. District of Columbia*, 331 U.S. App. D.C. 23, 146 F.3d 964, 974 n.20 (1998) (observing that where one party, Webb, was entitled to argue for an adverse inference, "the District, likewise, would be entitled to attempt to rebut it"); *cf. Krieger v. McLaughlin*, 50 Wn.2d 461, 462, 313 P.2d 361 (1957) (where party's lawyer asked and was granted permission to rebut his adversary's missing witness argument, he waived any error). The need to provide an opportunity to rebut the

missing witness inference was critical here because everyone but the jurors knew that their natural inference from this particular missing witness would be a false one.

We realize that allowing the rebuttal would have enabled the Cooks to present evidence of an opinion that had been excluded. But once the court decided that examination about the expert would be permitted,[12] the defendants should have been required to decide whether their interest in telling the jury about the expert's examination was more important than having it revealed that his opinion would have supported the Cooks. What was intolerable, and an abuse of discretion, was to allow the defendants to present evidence of the absent expert's existence and at the same time deny the Cooks the opportunity to rebut a false inference, naturally to be drawn by the jury, that the expert's opinion was unfavorable to the Cooks.

*Harmless error*

Both Stevens County and Tarbert contend that even if the court abused its discretion, the error was harmless.

An erroneous evidentiary ruling is not grounds for reversal absent prejudicial error. Error will be harmless "if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." *State v. Bourgeois*, 133 Wn.2d 389, 403,

---

[12] It is not clear why the court viewed evidence playing up Dr. Gill's asserted culpability as relevant. The court had already made a finding of no bad faith on the part of the Cooks that is well supported by the record.

945 P.3d 1120 (1997). An erroneous evidentiary ruling "is not prejudicial unless, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred." *State v. Tharp*, 96 Wn.2d 591, 599, 637 P.2d 961 (1981).

Stevens County was sued for negligently plowing too narrow a traversable roadway. The speeds at which Mr. Cook and Mr. Bean were driving were irrelevant to that issue. Evidence of Mr. Cook's speed was relevant only to the issue of his comparative fault for his injury. In completing the special verdict form, jurors stopped with their finding that Stevens County was not negligent. As to Stevens County, then, the court's error was harmless.

In completing the special verdict form, the jury similarly found that Tarbert was not negligent, but in Tarbert's case, the jury's determination as to negligence necessarily turned on what the jury concluded about the speeds at which Mr. Cook and Mr. Bean were driving beginning with their approach to the blind curve and up to the time of the collision. Speed was relevant to negligence in Tarbert's case. It nonetheless argues that the fact that the Cooks had an uncalled expert who examined the vehicle "was of little significance in the light of the evidence as a whole." Br. of Resp't Tarbert at 33. We disagree.

While the Cooks did not call an expert to testify to the speeds at which Mr. Cook and Mr. Bean were driving, Mr. Cook was an experienced heavy equipment and commercial vehicle driver whose home was on the primitive road, about a mile-and-a-

half from where the collision occurred. He provided a detailed account of how he was driving leading up to the collision and how it occurred. It is likely because of Mr. Cook's demonstrable familiarity with the road and extensive driving experience that Mr. Andersen was willing to try the case without an expert witness to support his client's version of events.

The defense argued that Mr. Cook's statements to deputies contradicted the testimony he gave at trial, but both deputies' reports were very brief and we cannot say that the jury would not have credited Mr. Cook's testimony. One of the deputies testified that based on the investigation, one or both of the drivers were traveling too fast for conditions, but he was unable to determine who. Jurors were instructed that they were the sole judges of the credibility of the witnesses and the value or weight to be given to their testimony, and that they were not required to accept the opinions expressed by experts. 6 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL § 1.02, at 24, § 2.10, at 53 (6th ed. 2012).[13]

The case was well defended by Tarbert's veteran lawyer, but considering all, there is a reasonable probability that the two negative inferences that the defendants were permitted to invite, in error, had a material effect on the outcome of trial. Because the

_____

[13] Although the court's instructions to the jury are not in our record, the parties' joint trial management report indicates that the standard expert witness and closing instructions would be given. CP at 145-49.

31

court's errors were not harmless in the case of the Cooks' claims against Tarbert and Mr. Bean, a new trial of those claims is required.[14]

We affirm the judgment in favor of Stevens County, reverse the judgment in favor of Tarbert Logging and its driver, and remand for a new trial.

_____
Siddoway, C.J.

WE CONCUR:

_____
Brown, J.

_____
Korsmo, J.

---

[14] Stevens County's and Tarbert's briefs request awards of attorney fees and costs. No basis for an award of reasonable attorney fees is identified. Under RAP 14, the prevailing parties are entitled to costs upon compliance with RAP 14.4.