IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| J.K., a minor, by BRUCE A. WOLF, his guardian ad litem; ELIZABETH A. EHLE; and JOE KETTENHOFEN, | No. 81234-3-I |
| Respondents, | DIVISION ONE |
| v. | PUBLISHED OPINION |
| BELLEVUE SCHOOL DISTRICT NO. 405, | |
| Appellant, | |
| KING COUNTY, and STATE OF WASHINGTON, | |
| Defendants. | |

CHUN, J. — This case concerns the sanction of a default judgment on liability for spoliation and discovery violations. Given the nature of appellant's conduct, we conclude that the trial court acted within its discretion.

On May 22, 2017, first-grader J.K. told his mother that a classmate, B.V., sexually abused him many times at their school, Eastgate Elementary (Eastgate) in the Bellevue School District (BSD). J.K.'s parents reported this to BSD, who in turn informed Child Protective Services (CPS) and the Bellevue Police Department.

Video cameras monitored Eastgate. The camera software system automatically and periodically overwrote old footage.

A records retention policy, applicable to BSD under RCW 40.14.070, required the preservation of documents, including video footage, related to reasonably anticipated litigation. But BSD took no action in May 2017 to preserve video footage from the school. Nor did it take any such action as these events took place: First, during an interview on June 1, J.K. told BSD that B.V. also abused him on a school bus. The school buses servicing Eastgate contained a camera system that overwrote footage. Second, on June 19, BSD received a tort claim form and a litigation hold request from J.K. directing it to preserve footage relating to J.K. and B.V. Third, on June 21, BSD's general counsel sent a similar litigation hold letter to BSD employees. And fourth, on October 10, J.K. served BSD with his complaint.

BSD did not act to preserve footage until December 8, 2017, during the discovery phase of the case and over six months after J.K.'s initial report of abuse. In the meantime, the camera systems automatically overwrote any footage that could have shown the children at school or on the bus.

BSD also engaged in numerous discovery violations. On November 9, 2017, J.K. served a set of interrogatories and document requests (First Set of Discovery) on BSD. J.K. asked BSD to identify and produce all documents, including video footage, concerning J.K. or B.V. and the investigation of the incidents. And J.K. asked that "[i]f any such document was, but is no longer, in [BSD's] possession . . . , please state what disposition was made of the document." BSD failed to respond by the deadline of December 9, 2017. On January 22, 2018, BSD submitted incomplete responses and in March, it

2

produced video from some school cameras showing footage after J.K. stopped attending Eastgate. J.K. moved to compel complete and non-evasive answers on May 18, 2018, and the trial court granted the motion on June 7, 2018. BSD did not comply with the order compelling discovery.

On March 22, 2019, J.K. served a second set of interrogatories and document requests (Second Set of Discovery). BSD failed to respond by the deadline of April 24. J.K. moved to compel this discovery on June 10. While the motion was pending, BSD submitted incomplete responses on June 12. On June 20, the trial court granted J.K.'s motion to compel, directing BSD to provide complete and non-evasive answers by June 27. After this deadline, BSD provided a supplemental answer on July 2, and then a second supplemental answer on July 12, providing new information each time. Because of BSD's conduct, J.K. could not determine what happened to the footage until close to the discovery cutoff date of September 24.

J.K. then moved for a sanction and the trial court entered a default judgment on liability. A jury determined damages. BSD appeals the sanctions order. For the reasons discussed below, we affirm.

I. BACKGROUND

A. Facts

J.K. started first grade at Eastgate in December 2016. B.V. was in J.K.'s class and they rode the same school bus. On May 22, 2017, J.K. told his mother that B.V. sexually abused him "almost every day" at school. He said the abuse had been happening in a school bathroom. The same day, J.K.'s parents

3

reported this to his teacher, Robin Forsman, and Eastgate's school counselor, Lindsay Verschueren. Verschueren informed CPS and the Bellevue Police Department. The last day B.V. and J.K. attended school together was Friday, May 19, 2017.

On May 23, 2017, BSD counselor Deb Kraft and Verschueren interviewed J.K. and concluded that he was credible.

During the 2016–2017 school year, Eastgate had eight surveillance cameras. Cameras 1–7 were outside the school building and Camera 8 was inside a wiring closet. Cameras 1–4 were not operating during the time J.K. and B.V. attended school together. With no action taken to preserve footage, the camera systems automatically overwrote old footage to free up storage capacity. The school cameras retained footage for at least 30 days but could hold it up to six months.

The Local Government Common Records Retention Schedule Version 4.0 (CORE) sets forth the retention schedule for BSD's camera footage. CORE prohibits the destruction of footage subject to "ongoing or reasonably anticipated litigation." RCW 40.14.070 governs public record retention schedules such as CORE and provides that such schedules are the "authority" for public records destruction practices.

On May 24, 2017, Eastgate principal Steve Lesco placed an "urgent" request for the BSD technology department to install software on his computer so he could review footage because of a "student safety issue." The next day, network engineer David Roberts installed the software. In an e-mail to Lesco

that day, Roberts explained that he had discovered that Cameras 1–4 had not been operational during the time J.K. attended Eastgate but that the remaining cameras, Cameras 5–8, had been recording footage. On May 25, 2017, Lesco prepared a notice of disciplinary action stating that, on at least two days, B.V. inappropriately touched another student.

BSD placed B.V. on "emergency expulsion" for 13 days. B.V. then accused J.K. of bullying, and Lesco investigated that accusation. On June 1, 2017, during an interview related to B.V.'s bullying claim, J.K. told Lesco that B.V. had pulled down J.K.'s pants while on the bus. J.K. did not specify when or how often B.V. abused him on the bus. Lesco ended the interview without asking more questions. He did not inform the police or CPS about this allegation and did not investigate J.K.'s comment further. Lesco shared J.K.'s comment with BSD's administrators over e-mail. The executive director of schools, Patricia Siegwarth, responded by e-mail, stating in part, "As much as possible, refrain from communicating info related to this situation on email. It's best we discuss in person."

The school buses also had surveillance cameras. BSD installed a new camera system in its buses in April 2017, and that system retained footage for about 30 days.

On June 6, 2017, Lesco e-mailed J.K.'s mother, confirming that, based on his investigation, inappropriate touching occurred. Up to this point in time, BSD took no steps to preserve any video footage.

5

B. Procedural History

On June 19, 2017, BSD received a tort claim form and a litigation hold letter from J.K. requesting that BSD preserve documents related to J.K. and B.V., including surveillance video footage from the school and the buses from December 2016 onward.  On June 21, BSD employees received an internal litigation hold letter from its general counsel instructing them to preserve documents relating to J.K. and suspend standard document destruction programs.  The letter also explained that "documents" included electronic information and that failure to preserve documents could lead to "severe sanctions."  BSD still did not take any steps to preserve video footage.

On October 10, 2017, J.K. served BSD with his complaint.  On November 9, 2017, J.K. served BSD with the First Set of Discovery seeking information, documents, and video recordings related to J.K. or B.V.  Among other requests, the First Set of Discovery asked BSD to identify:

- "[E]ach document, which you possess or have the legal right to obtain, pertaining to JK or BV."

- "[E]ach document, which you possess or have the legal right to obtain, pertaining to all investigations of the Incidents."

- "[E]ach document, which you possess or have the legal right to obtain, pertaining to video or audio recordings of JK or BV on the premises of Eastgate Elementary School or on your school buses during the 2016-17 school year, including without limitation video recordings, audio recordings, and electronically stored information."

- "[E]ach document, which you possess or have the legal right to obtain, pertaining to your use of video or audio recording equipment on school buses, including without limitation identification of buses outfitted with recording equipment, procedures for use of the equipment, review processes for recording media, use of the equipment in documenting instances of inappropriate student behavior, and procedures for proper disposal of recording media."

The First Set of Discovery requested, "If any such document was, but is no longer, in [BSD's] possession . . . , please state what disposition was made of the document." The First Set of Discovery defined "document" to include "video recording[s]." The responses were due December 9.

On December 8, 2017, for the first time, BSD acted to preserve surveillance camera footage when paralegal Maureen Lutz e-mailed Roberts to request that he retrieve video from school Cameras 5–8. Roberts managed to preserve about six months of video dating back to May 27, 2017, which was eight days after the children had stopped attending school together. The camera systems overwrote all older footage. No one acted to preserve bus footage at any time.

On January 22, 2018, BSD responded to the First Set of Discovery. BSD said there was no responsive bus video, that bus footage is periodically overwritten, and that the potentially responsive school video dated back to May 27 and no earlier.[1] BSD did not indicate whether it previously possessed any responsive footage. In March 2018, BSD produced school footage going back to May 27, 2017—after J.K. stopped attending school at Eastgate. On May

---

[1] BSD's response stated:

There are no audio or video recordings on any school bus that pertain to this request. Video recordings are generally overwritten on a periodic basis and the District's search does not reveal any video or audio recordings that meet your request.

There are no video cameras inside of the school. There are video cameras outside only. There is video footage on Eastgate's outside cameras, going back to May 27, 2017. It will take some time to review them to determine if there are any video/audio recordings that meet our request. The District has started reviewing the footage and will supplement this interrogatory once the review is completed. The District hopes to have the review completed by February 10, 2018.

18, 2018, J.K. moved to compel complete and non-evasive answers and, on June 7, the trial court ordered BSD to identify and produce all documents, including videos, related to J.K. and B.V. by June 27. Nothing in the record suggests that BSD complied with this order.[2]

On January 22, 2019, J.K. deposed Lesco but apparently did not ask him whether he had reviewed any school or bus footage before it had been overwritten.

On March 25, 2019, J.K. served BSD with a second set of discovery requests (Second Set of Discovery). This set asked BSD to identify each person who had attempted to review video footage or with information about the destruction of the footage. The deadline for responses was April 24. BSD failed to meet the deadline and J.K. moved to compel.

On June 12, 2019, while the motion to compel was pending, BSD responded to the Second Set of Discovery but did not identify people with knowledge of the destruction of footage, produce e-mails between Lesco and Roberts about reviewing the footage, or verify the answers to interrogatories. On June 20, 2019, the trial court ordered BSD to provide complete and non-evasive answers to the Second Set of Discovery by June 27. BSD did not provide the answers by this deadline. On July 2, BSD provided a supplemental response to the Second Set of Discovery. The responses still did not identify people with knowledge about the destruction of the footage and did not provide e-mail

---

[2] In its sanctions order of October 22, 2019, the trial court found that BSD failed to comply with this order compelling discovery.

exchanges about reviewing footage. Ten days later, on July 12, BSD served a second supplemental response to the Second Set of Discovery. This response identified Roberts as someone with knowledge about the footage destruction and explained that the camera system it installed on buses in April 2017 automatically destroyed video after approximately 30 days. And for the first time, BSD identified John Harvey, a bus driver who had reviewed bus footage from the 2016–2017 school year. BSD still did not provide responsive e-mail exchanges.

On August 14, 2019, J.K. deposed Roberts. He testified about Lutz's request that he preserve footage. He said he was surprised that he could preserve six months of footage and that if someone at BSD had earlier asked for footage he possibly could have retrieved six months of footage, partially covering the time J.K. and B.V. attended school together. He also mentioned his e-mail exchange with Lesco about installing software for Lesco's review. J.K. then asked BSD to produce the e-mails Roberts mentioned in his deposition. BSD complied on August 16.

On September 23, 2019, the day before the discovery cutoff date, J.K. moved for a discovery sanction of a default judgment on liability against BSD. BSD attached to its response a map of school cameras, which showed that Camera 8 is an interior camera. Until that point, BSD had claimed there were no cameras inside the building. BSD also attached its internal litigation hold letter, which it had not yet produced.

The trial court heard oral argument on the motion. The court concluded that BSD had spoliated school and bus camera footage. And it concluded that

BSD repeatedly violated discovery rules and the court's discovery orders. The court granted J.K.'s motion in part and granted default judgment on liability. It entered written findings of fact and conclusions of law. At trial, the court instructed the jury that BSD owed a duty of care to J.K., B.V. sexually assaulted J.K. multiple times, BSD had footage of interactions between B.V. and J.K., BSD no longer possessed the footage, BSD breached its duty of care, and BSD's breach proximately caused damages in an amount to be determined at trial. The court also prohibited either party from introducing expert evidence about the accuracy or lack thereof of J.K.'s memory. Finally, the court awarded costs and fees to J.K.

BSD moved for reconsideration or, in the alternative, a stay of the trial. BSD supported its motion with a declaration from Roberts, which included an attachment showing the field of view of the eight cameras at Eastgate. Review of this attachment was the first time the court or J.K. saw the field of view of all the school cameras. The trial court denied BSD's motions.

A jury determined that BSD's negligence caused J.K. $500,000 in damages.

## II. ANALYSIS

### A. Standard of Review

We review the trial court's findings of fact for substantial evidence.[3] See Robinson v. Am. Legion Dep't of Wash., Inc., 11 Wn. App. 2d 274, 286 n.4, 452

---

[3] BSD says, because the trial court's findings stemmed from a written record, we should review de novo the trial court's findings of fact. We disagree. "[W]here the record at trial consists entirely of written documents and the trial court was not required

10

P.3d 1254 (2020). "'Substantial evidence' is the quantum of evidence 'sufficient to persuade a rational fair-minded person the premise is true.'" Hoover v. Warner, 189 Wn. App. 509, 520, 358 P.3d 1174 (2015) (quoting Sunnyside Valley Irrig. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003)).

We review a trial court's decision imposing sanctions for spoliation or discovery violations for abuse of discretion. Cook v. Tarbert Logging, Inc., 190 Wn. App. 448, 461, 360 P.3d 855 (2015) (spoliation sanction); Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 582–83, 587 220 P.3d 191 (2009) (discovery sanctions). "A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons." Cook, 190 Wn. App. at 461. We "give wide latitude to a trial court in fashioning

---

to assess witness credibility, the appellate court ordinarily applies de novo review." Robinson v. Am. Legion Dep't of Washington, Inc., 11 Wn. App. 2d 274, 286 n.4, 452 P.3d 1254 (2020). "But substantial evidence review is nonetheless appropriate where, as here, competing documentary evidence had to be weighed and conflicts resolved." Id.; see also Dolan v. King County, 172 Wn.2d 299, 310–11, 258 P.3d 20 (2011) ("substantial evidence is more appropriate, even if the credibility of witnesses is not specifically at issue, in cases such as this where the trial court reviewed an enormous amount of documentary evidence, weighed that evidence, resolved inevitable evidentiary conflicts and discrepancies, and issued statutorily mandated written findings."). Here, there was no live witness testimony, but the trial court looked at an extensive record, weighed documentary evidence, and resolved evidentiary conflicts to issue its written findings. Thus, we apply the substantial evidence standard. See Magaña v. Hyundai Motor Am., 167 Wn.2d 570, 583, 587, 220 P.3d 191 (2009) (applying substantial evidence review to findings of fact supporting a discovery sanction); see also Dolan, 172 Wn.2d at 310–11 (noting that the "deference rationale [is] not limited to credibility determinations but [is] also grounded in fact-finding expertise and conservation of judicial resources." (citing Anderson v. City of Bessemer City, 470 U.S. 564, 574–75, 105 S. Ct. 1504, 84 L. Ed. 2d 518 (1985))); Westmark Dev. Corp. v. City of Burien, 140 Wn. App. 540, 564, 166 P.3d 813 (2007) (rejecting a de novo standard of review in assessing a discovery violation sanction imposed based on a written record); see GR 14.1(c) ("Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions.").

an appropriate sanction for discovery abuse." Barton v. Dep't of Transp., 178 Wn.2d 193, 214–15, 308 P.3d 597 (2013).

We review de novo whether a duty to preserve evidence exists. Cook, 190 Wn. App. at 461. And we review de novo whether a trial court applied the correct legal standard for willfulness in assessing sanctions for discovery violations. See State v. Corona, 164 Wn. App. 76, 79, 261 P.3d 680 (2011).

We first address whether the trial court erred in determining that BSD committed sanctionable spoliation. We then address whether it erred in imposing the sanction at issue for spoliation and discovery violations.

## B. Spoliation

BSD says that it did not commit sanctionable spoliation because the destroyed video footage is irrelevant and BSD lacked the requisite culpability. BSD also contends that Washington case law does not permit default judgments for spoliation. J.K. responds that the footage was potentially important, BSD acted in bad faith in failing to preserve it, and the cases BSD cites are distinguishable. We conclude that the trial court acted within its discretion in concluding that BSD committed sanctionable spoliation.

Spoliation is "'[t]he intentional destruction of evidence'" and "jurisdictions modernly treat the term as 'encompass[ing] a broad range of acts.'" Cook, 190 Wn. App. at 461 (alterations in original) (quoting Henderson v. Tyrrell, 80 Wn. App. 592, 605, 910 P.2d 522 (1996)). In deciding whether sanctionable spoliation occurred, courts weigh: "(1) the potential importance or relevance of the missing evidence and (2) the culpability or fault of the adverse [and

12

spoliating] party." Tavai v. Walmart Stores, Inc., 176 Wn. App. 122, 135, 307 P.3d 811 (2013).

　　1.　The video footage was potentially important or relevant.

BSD says the destroyed video footage was not relevant enough to warrant sanctions. It says the cameras do not capture the areas where the two children would have interacted.[4] J.K. responds that the footage was potentially important and that BSD gained an investigatory advantage by reviewing the footage and denying J.K. the same opportunity. We conclude that the school and bus camera footage were potentially relevant or important.

"Whether the missing evidence is important or relevant depends on the particular circumstances of the case." Id. at 135. "In weighing the importance of the evidence, we consider whether the [non-spoliating] party was given an adequate opportunity to examine it." Id. And "[w]hether destruction of the evidence gave the culpable party an investigative advantage is a consideration." Cook, 190 Wn. App. at 462. "In weighing the importance of the destroyed evidence, the fact that the culpable party itself investigated the evidence is relevant but not determinative." Id.

---

[4] BSD contends that the trial court improperly imposed spoliation sanctions without determining that the evidence was potentially relevant. The trial court said ascertaining the importance of the destroyed footage is difficult because of their destruction. Citing a federal case, Omnigen Research v. Wang, the court then concluded, "The Defendant cannot claim that the missing video files are not relevant." 321 F.R.D. 367, 377 (D. Or. 2017). As noted above, Washington courts consider potential relevance when assessing spoliation. See Tavai, 176 Wn. App. at 135. But regardless of the trial court's conclusion, the record supports a finding that the spoliated evidence was potentially relevant. See State v. Smith, 165 Wn. App. 296, 308, 266 P.3d 250 (2011) (appellate courts may affirm a trial court's decision on "any ground the record supports"), aff'd on other grounds, 177 Wn.2d 533, 303 P.3d 1047 (2013).

13

> a.  The cameras likely captured potentially important or relevant footage

In a declaration, Roberts explained the positioning and field of view of each of the cameras in Eastgate.  He explained that the children would have accessed the restroom where the abuse allegedly occurred through a door from the playground and he centered his assessment on that door.  He said, "Cameras 1 through 4 are the only four cameras that would have any vantage point to 'see' whether these two students accessed the school bathroom through the doors in the Kindergarten-1st grade hallway."  But Cameras 1–4 were not operational during the relevant time.  He said that Camera 8 was the only interior camera, but it shows only the inside of the network wiring closet; the remaining cameras, Cameras 5–7, were outside.  He stated that "there is nothing in the visual field of Cameras 5–8 that depicts areas where these two students played, nor where they could have accessed the school through the Kindergarten-1st grade door and hallway."

Roberts attached a map of the location of each camera and screenshots of each camera's field of view.  Cameras 6 and 7[5] were on the opposite side of the building from the playground and the hallway door leading to the restroom, so that area was not within their field of view at all.  Camera 5 was located closer to the pertinent area and the playground was in the background of its field of view.  But the door to the restroom is not visible.

---

[5] Camera 7 shows a different playground; no indication exists that J.K. and B.V. would have had access to that playground.  Camera 6 shows the front of the school property; it is unclear whether this is where the children would have boarded the bus.

We conclude that the school camera footage was potentially important or relevant. Granted, none of the spaces J.K. and B.V. allegedly occupied was in the field of view of Cameras 6 and 7. But it is possible the two cameras could have captured relevant material, such as a playground supervisor not at their post.[6] And despite Roberts's assertion otherwise, Camera 5 shows the playground where the children spent recess in the background. Though the playground is in the distance, it is still possible that footage from the camera could have shown J.K. and B.V. interacting and given some idea about the supervision on the playground.

The bus footage is even more likely to have been important or relevant. The two children rode the bus together, and so they would have appeared on bus camera footage. Such footage could have shown their interactions with each other, been used to identify other children to interview, shown the bus driver's supervision, and even shown abuse. BSD contends that the bus footage is only minimally relevant at best because J.K. did not say how many instances of abuse occurred on the bus, that J.K. and B.V. sat together on the bus was undisputed, and Lesco interviewed other children about the abuse.[7] But even if abuse occurred only once on the bus, the footage could still be useful. That J.K. and

---

[6] The adequacy of supervision was relevant to whether BSD breached a duty and was contested at trial.

[7] BSD also contends that because it did not know to preserve bus footage until June 19 or 21 when it received the litigation hold letters, any footage it preserved at that point would date only to the end of May, around when the children stopped riding the bus together. But as discussed below, we conclude that BSD's duty to preserve bus footage arose on May 22. So, the inquiry here is whether about a month of footage was potentially important or relevant.

B.V. sat together on the bus is not the only information that could be gleaned from footage. And assuming Lesco interviewed other children, the footage may have revealed information besides what Lesco discovered.

BSD cites Tavai to argue that sanctions are improper here. 176 Wn. App. at 135–36. There, the plaintiff slipped and fell in a puddle of water at a Walmart store. Id. at 125. Walmart preserved no video footage from the day of the fall. Id. at 134. The court determined that while footage of the area where the plaintiff fell would likely be important to show the source of the water, the plaintiff failed to establish that the destroyed footage covered the area where she fell. Id. at 135. The court also noted that the plaintiff's own expert agreed that the destroyed footage did not capture her fall. Id. at 135–36.

Here, no expert says that the footage would not have captured the areas at issue. And as discussed above, some cameras could have captured relevant footage. Also, Tavai centers on a more limited physical location: where the plaintiff fell. Here, the focus includes BSD's supervision of children as well as the alleged abuse. Nor does Tavai support a determination that destruction of the bus footage, which BSD cannot claim would not show the children, was not spoliation.

b. J.K. had no chance to review the spoliated footage

That J.K. had no chance to examine the destroyed footage supports the trial court's order.[8] Cf. Marshall v. Bally's Pacwest, Inc., 94 Wn. App. 372, 382,

---

[8] The parties dispute whether circumstantial evidence supports a finding that BSD reviewed the spoliated footage before it was overwritten. We conclude that substantial evidence does not support the trial court's findings that BSD reviewed the

972 P.2d 475 (1999) (determining that adverse-inference instructions for spoliation were improper when the plaintiff had four years to request an inspection of a treadmill before its destruction); Henderson, 80 Wn. App. at 608–09 ("both parties had the opportunity to retain experts to inspect the car during the two years after the accident" before the car was destroyed, the "investigative value" of the car was questionable, and many photographs of the car remained in determining that an adverse-inference instruction was improper).

2. BSD had the requisite culpability to justify sanctions

BSD says that it lacked the requisite culpability to warrant the sanctions the court imposed; it contends that, at most, it was negligent. J.K. responds that BSD acted in bad faith or, at least, with gross negligence. We conclude the trial court acted within its discretion in determining that BSD acted with the requisite culpability to warrant sanctions.

"[I]n determining the adverse party's culpability, the trial court can consider the party's bad faith, whether that party had a duty to preserve the evidence, and whether the party knew that the evidence was important to the pending litigation." Homeworks Constr., Inc. v. Wells, 133 Wn. App. 892, 900, 138 P.3d 654 (2006). Spoliation may encompass a "broad range of acts beyond those that are purely

---

spoliated footage. But whether BSD reviewed the footage is not "determinative" on whether sanctionable spoliation occurred. See Cook, 190 Wn. App. at 462. Because we conclude substantial evidence does not support a finding that BSD reviewed the spoliated footage, the trial court's findings that stem from the finding of review are similarly unsupported (specifically, findings of fact 28, 29, 49, and 50). But those findings are unnecessary for a conclusion of spoliation. See Tavai, 176 Wn. App. at 135 (holding that, in determining whether sanctionable spoliation has occurred, a court weighs the potential relevance of the destroyed evidence and the culpability of the party who destroyed the evidence). And we may affirm the trial court on any ground supported by the record. Smith, 165 Wn. App. at 308.

intentional or done in bad faith," so "a party may be responsible for spoliation without a finding of bad faith." Id. "But even under this theory, the party must do more than disregard the importance of the evidence; the party must also have a duty to preserve the evidence." Id. No sanctionable spoliation occurs when a party has an "innocent explanation" for the destruction or negligently failed to "preserve evidence relevant to foreseeable litigation." Cook, 190 Wn. App. at 462, 464. No general duty to preserve evidence exists in Washington, but the duty can arise from other sources. Id. at 470; see Homeworks, 133 Wn. App. at 901 ("the Henderson court looked to other sources for duty such as the duty of a partner to preserve records or the duty of a medical provider to save medical information.").

According to CORE—under RCW 40.14.070[9]—"Public records must not be destroyed if they are subject to *ongoing or reasonably anticipated litigation*. Such public records must be managed in accordance with the agency's policies and procedures for legal holds." (Emphasis added.)

On May 22, 2017, J.K. reported sexual abuse occurring on an almost daily basis to his mother and she reported the abuse to the school. The school

---

[9] RCW 40.14.070(b) provides:

A local government agency . . . may elect to establish a records control program based on recurring disposition schedules recommended by the agency to the local records committee. . . . Upon such approval, the schedule shall constitute *authority* for the local government agency to destroy the records listed thereon, after the required retention period, on a recurring basis until the schedule is either amended or revised by the committee.

(Emphasis added.)

notified CPS and the police. On May 23, Kraft and Verschueren interviewed J.K. and concluded he was credible.

On May 24, Lesco sent an "urgent" request to Roberts asking him to install software on his computer to view school camera footage because of a "student safety issue." On June 1, during Lesco's interview of J.K., J.K. mentioned for the first time that B.V. had pulled down his pants on the bus. Lesco e-mailed BSD administrators including Siegwarth, informing them of the new allegation and, Siegwarth responded, "As much as possible, refrain from communicating info related to this situation on email. It's best we discuss in person."

On June 19, 2017, BSD received a litigation hold from J.K., requesting that it preserve all documents dated after December 2016, including "surveillance video footage." Two days later, BSD's general counsel sent an internal litigation hold letter to BSD employees requesting preservation of any documents relating to this matter and instructing them to "suspend all standard document destruction programs." The letter noted the importance of such preservation and emphasized that failure to preserve evidence could lead to severe sanctions. But BSD did not act to preserve school video footage until December 8, when Lutz requested Roberts retrieve video footage from the school cameras. And BSD never acted to preserve bus footage.

The trial court found that, for purposes of CORE, as of May 22, 2017, BSD employees reasonably anticipated litigation.[10] It found that BSD employees knew

---

[10] If BSD sought to preserve the footage that day, it could have preserved between one month and six months of footage. Footage from that time range would have almost entirely overlapped with when the children attended school together.

on that date that video footage of the children was potentially important evidence in investigations and in potential litigation. It found that BSD employees were aware of the CORE preservation requirements, knew that the camera systems would overwrite footage if not stopped, and took no action to preserve the evidence. The court made the same findings about May 23 (when BSD employees interviewed J.K. and found him credible), May 25 (when Lesco requested software to review camera footage), and June 1 (when J.K. reported abuse on the bus). The court found that BSD did not act to preserve any footage until on or around December 8, 2017.

The trial court concluded that BSD violated its own records-retention policy—CORE—by failing to preserve school and bus footage and this conduct was a "willful withholding and destruction" of the school and bus files constituting spoliation.

a. BSD breached a duty to preserve the footage

The CORE retention policy imposed a duty on BSD to preserve the school and bus footage and BSD breached that duty. BSD acknowledges that it had a duty to preserve the video footage, but the parties disagree as to when that duty arose. BSD claims it had no duty to preserve until June 19, 2017, when it received J.K.'s litigation hold request. BSD says it did not have a duty before that point because, under Cook, no general duty exists to preserve evidence. J.K. claims that the duty arose under CORE on May 22, 2017, when J.K. first revealed the abuse.

20

The CORE document retention policy applies when litigation is reasonably anticipated.[11] Based on the seriousness of J.K.'s allegation of repeated sexual abuse, BSD should have reasonably anticipated litigation starting May 22 when J.K.'s mother first informed the school of the alleged abuse. Thus, the duty to preserve the school footage arose then. BSD took the allegation seriously enough to report it to CPS and police. The duty to preserve bus footage also arose then because BSD knew the two children rode the bus together. With each event that followed—such as the determination that J.K. was credible, B.V.'s expulsion, J.K.'s allegation of abuse on the bus, J.K.'s litigation hold request, and the internal litigation hold letter—BSD should have realized that litigation was becoming increasingly likely. Siegwarth's e-mail to Lesco on June 2, urging him not to discuss the matter over e-mail suggests that BSD anticipated litigation at that point.[12] Yet BSD did not act to preserve school footage until early December, about half a year after the abuse first surfaced. And no indication exists that BSD tried to preserve any bus footage.

BSD concedes that a duty to preserve evidence arose on June 19 but fails to provide an innocent explanation for destruction of evidence after that date. As

---

[11] CORE does not say it applies when litigation *should* reasonably be anticipated. But we assess when BSD should have reasonably anticipated litigation because otherwise the standard makes little sense. See Musse v. King County., No. C18-1736-JCC, 2021 WL 4709875, at *3 (W.D. Wash. Oct. 8, 2021) (assessing whether a spoliating party "*should* have reasonably foreseen litigation" (emphasis added)). BSD does not argue that the lack of anticipation of litigation—albeit unreasonable—can somehow excuse the preservation obligation.

[12] BSD emphasizes that Siegwarth explained that her e-mail was about protecting the privacy of the children involved, and that her comment did not show the anticipation of litigation. But privacy can be protected in a number of ways, such as using initials or pseudonyms. We conclude substantial evidence supports the court's finding that Siegwarth's e-mail shows that she and Lesco anticipated litigation.

discussed above, BSD contends that the school footage was irrelevant, but we conclude that it was potentially important or relevant. BSD contends that it did not act to preserve bus footage on June 19 because only a day or two of footage would have been preserved. But a day or two of footage is still potentially important, particularly given J.K.'s allegation that the abuse occurred almost every day. BSD's explanation does not support a determination that it was not culpable.

BSD cites <u>Cook</u> and <u>Henderson</u> to argue that spoliation sanctions are improper here. But those cases are distinguishable. The court in <u>Cook</u> recognized that no general duty exists to preserve evidence and held that the defendant did not create a duty to preserve a truck involved in an accident by asking the plaintiff to preserve it. 190 Wn. App. at 464. The court in <u>Henderson</u> similarly concluded no external duty to preserve evidence existed and that no evidence supported a conclusion that the defendant acted in bad faith in destroying evidence. 80 Wn. App. at 610. Here there was a duty and BSD failed to meet it.

        b. BSD knew the potential importance of the footage and was not
            merely negligent

BSD says it was, at worst, negligent. It contends that because the camera systems automatically overwrite footage, it did not intentionally destroy footage. But BSD cites no law supporting its contention that inaction cannot be intentional.

Lesco's e-mail requesting software to review footage characterized the situation as an urgent safety matter. That e-mail shows that BSD employees

understood the importance of quickly reviewing the footage.  Homeworks, 133 Wn. App. at 900 (noting that a duty to preserve evidence paired with a party's disregard of the importance of the evidence supports a finding of culpability). Also, the internal litigation hold letter clearly stated the importance of preserving evidence and instructed BSD employees to suspend automatic deletion of documents.

BSD had a duty to preserve the camera footage, knew the potential importance of the footage, and failed to take action to preserve the footage for about six months.  By the time BSD acted to preserve it, footage from when both children attended school together was gone.  See id. ("in determining the adverse party's culpability, the trial court can consider the party's bad faith"). BSD acted with sufficient culpability to justify sanctions thus, on this basis, the court did not abuse its discretion by sanctioning BSD.

3. A partial default judgment is a permissible sanction for spoliation combined with discovery rule and order violations

BSD says that even if sanctions were warranted for spoliation, the sanctions imposed here were too harsh and unsupported by spoliation case law. J.K. responds that trial courts can treat spoliation as a discovery violation and order discovery sanctions, such as a default judgment, as a remedy.  We hold that when, as here, a party engages in a combination of spoliation and violations of discovery rules and orders, a default judgment is a permissible sanction.

BSD claims the trial court abused its discretion by entering a default judgment as to liability because Washington courts have traditionally approached

spoliation as an evidentiary matter and remedied the spoliation through an adverse-inference instruction. See Henderson, 80 Wn. App. at 605 (noting that spoliation "historically has been treated as an evidentiary matter; the common remedy" is an adverse-inference instruction); see, e.g., Homeworks, 133 Wn. App. at 901 (spoliation case ruling on an adverse-inference instruction); Tavai, 176 Wn. App. at 136 (same). But courts in other jurisdictions have allowed default judgments in spoliation cases.[13] Moreover, here, the court entered the default judgment not only for the spoliation, but also for the discovery violations. As discussed below, a default judgment is a permissible sanction for discovery violations. And courts have treated "spoliation as a civil discovery violation, the remedy for which is a sanction provided by Fed. R. Civ. P. 37 (or its state counterpart) or by the courts' inherent power to control litigation."[14] Henderson,

---

[13] See Consumer Fin. Prot. Bureau v. Morgan Drexen, Inc., 101 F. Supp. 3d 856, 868 (C.D. Cal. 2015) ("'A court may sanction spoliation by: imposing monetary sanctions; instructing the jury to draw an adverse inference against the despoiling party; excluding testimony based on despoiled evidence proffered by the despoiling party; or, if willfulness is found, *entering default judgment against the despoiling party*.'" (emphasis added) (quoting Columbia Pictures, Inc. v. Bunnell, No. 2:06CV01093 FMC–JCX, 2007 WL 4877701, at *4 (C.D.Cal. Dec. 13, 2007)); Peschel v. City of Missoula, 664 F. Supp. 2d 1137, 1142 (D. Mont. 2009) ("court[s] may also dismiss an action or enter a default judgment" when "spoliated evidence relates to the matters in controversy in such a way that its spoliation threatens to interfere with the rightful decision of the case"); Carmichael v. Separators, Inc., 148 N.E.3d 1048, 1062–63 (Ind. Ct. App.) (affirming a default judgment as a sanction for "discovery misconduct" including spoliation), transfer denied, 157 N.E.3d 521 (Ind. 2020); Cooper Tire & Rubber Co. v. Koch, 303 Ga. 336, 339, 812 S.E.2d 256 (2018) ("A trial court's finding that a party lost or destroyed relevant evidence may lead to sanctions . . . , the entry of a default judgment, or the dismissal of the case."); Victor Stanley, Inc. v. Creative Pipe, Inc., 269 F.R.D. 497, 534 (D. Md. 2010) ("Courts may order a default judgment or dismissal" for spoliation).

[14] "There are a variety of different approaches to the problem of spoliation; it can be viewed as an evidentiary matter, or as a violation of civil discovery requirements, as a criminal violation, or as an independent tort." 16A DAVID K. DEWOLF & KELLER W. ALLEN, WASHINGTON PRACTICE: TORT LAW AND PRACTICE § 22.15 (5th ed. 2020) (footnotes omitted).

80 Wn. App. at 605. Thus, we conclude that this was a permissible sanction.[15]

C. Discovery Violations

BSD says that the trial court's sanctions were too harsh and unsupported by law and fact. We disagree.

"Discovery sanctions are generally within the sound discretion of the trial court." Teter v. Deck, 174 Wn.2d 207, 216, 274 P.3d 336 (2012). If a party violates a discovery order, CR 37(d) authorizes the trial court to impose sanctions listed in CR 37(b)(2), which includes a default judgment. Magaña, 167 Wn.2d at 583–84. A default judgment is a harsh remedy for which the trial court must conduct a Burnet analysis[16] on the record. Id. at 584; Teter, 174 Wn.2d at 217. A trial court may impose a default judgment upon a showing that "(1) the discovery violation was willful or deliberate, (2) the violation substantially prejudiced the opponent's ability to prepare for trial, and (3) the court explicitly considered less severe sanctions." Teter, 174 Wn.2d at 216–17. "'The purposes of sanctions orders are to deter, to punish, to compensate and to educate.'"

---

[15] BSD also claims that the court erred because no Washington law supports a default judgment paired with an adverse inference instruction. It says that the instructions here were more severe than adverse inference instructions because they told the jury conclusively that B.V. abused J.K., that BSD cameras recorded footage of B.V. and J.K. interacting, and that BSD no longer possessed the footage. But BSD cites no law prohibiting a court from imposing a default judgment via instructions such as these. Aside from its broader contention that Washington law prohibits default judgments for spoliation, BSD makes no supported argument that the manner in which the court imposed the default judgment here was legal error. Because we conclude that a default judgment was a permissible sanction in this case and because trial courts exercise "'broad discretion'" in imposing discovery sanctions, we reject this contention. See Magaña, 167 Wn.2d at 582 (quoting Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006)).

[16] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997) sets forth a three-pronged test to determine whether a harsh discovery sanction is warranted.

Magaña, 167 Wn.2d at 584 (quoting Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wn.2d 299, 356, 858 P.2d 1054 (1993)).

   1. BSD's challenges to the trial court's conclusions supporting its sanctions ruling are unpersuasive

BSD contends that J.K. is essentially complaining that it did not disclose information sooner. It emphasizes that it provided responses and information before the discovery cutoff date. We determine that the trial court acted within its discretion by concluding BSD committed sanctionable discovery violations.

The trial court concluded that, on several occasions, BSD acted in willful disregard of its own records-retention policy, civil discovery rules, and the court's discovery orders. The trial court listed 14 instances of BSD's willful conduct.

BSD discusses some of the trial court's conclusions and contends that they were in error and its conduct was not sanctionable.

First, BSD challenges the trial court's conclusion that BSD failed to adhere to its general counsel's internal litigation hold request. BSD asserts Cameras 1–4 were not recording, footage from Cameras 5–8 would be irrelevant, and by the time it received the internal litigation hold on June 21, 2017, it could have preserved at most a day or two of bus footage showing the children. As discussed above, footage from Cameras 5, 6, and 7 was potentially relevant. And BSD cannot claim that a day or two of footage[17] showing the children together on the bus would have been irrelevant.

---

[17] As discussed above, we determine that the duty to preserve bus evidence arose on May 22. If BSD acted then to preserve bus evidence, there would have been more than a day or two of footage. But this issue concerns BSD's failure to adhere to the litigation hold letter received on June 21.

Second, BSD challenges the trial court's conclusions that BSD failed to timely disclose the e-mail exchange between Lesco and Roberts about installing software and failed to timely identify Roberts as a person with knowledge of the circumstances of the destruction of school footage. The court concluded that the former violated its June 7, 2018 order compelling complete and non-evasive responses. BSD emphasizes that it did both before the discovery cutoff date of September 24, 2019. But BSD had prior opportunities to identify Roberts and did not do so until its second set of supplemental responses to the Second Set of Discovery, two weeks after the court's deadline of June 27, 2019. And BSD produced the e-mails between Lesco and Roberts only after Roberts mentioned the e-mails during his deposition on August 14, 2019 and J.K. specifically requested their production. BSD produced the e-mails on August 16, 2019, which was over a year after the trial court's deadline for its June 7, 2018 order to compel. And production was only about four weeks before the discovery cutoff, depriving J.K. of significant time to conduct follow-up discovery. BSD does not explain why it did not timely identify Roberts or produce the e-mail exchange.

Third, BSD challenges the trial court's conclusion that BSD violated its June 7, 2018 order to compel. The order required that BSD identify each document pertaining to J.K. or B.V. and pertaining to investigations of J.K.'s allegations, and to produce these documents. BSD notes that the trial court did not specify which documents BSD failed to provide and that it provided multiple documents over the course of discovery. But BSD identifies no documents that it produced in response to the court's order.

27

Fourth, BSD challenges the trial court's conclusion that it misinformed J.K. in its first interrogatory answer about footage of J.K. and B.V. by saying there was "no audio or video recordings on any school bus" without saying that the reason there was no such footage was because BSD destroyed it. BSD emphasizes that in the same interrogatory answer it explained, "Video recordings are generally overwritten on a periodic basis." And BSD says it also explained the overwriting process in a supplemental interrogatory response six months later. But the First Set of Discovery asked, "If any [requested] document was, but is no longer, in [BSD's] possession, . . . please state what disposition was made of the document." BSD sought to evade this request by saying, "Video recordings are generally overwritten on a periodic basis," which did not inform J.K. that there once was potentially relevant footage and that it no longer existed given the amount of time that had passed and BSD's inaction.[18]

2. The Burnet analysis

a. The trial court applied the correct law for willfulness

BSD says that the trial court applied the wrong law for willfulness. It contends that Jones v. City of Seattle, 179 Wn.2d 322, 345, 314 P.3d 380 (2013), overrules the Magaña rule that the trial court relied on, and that "something more" than a discovery violation is needed to find willfulness. J.K.

---

[18] BSD also challenges the trial court's conclusion that BSD misinformed J.K. that there were no video cameras inside the school, since Camera 8 was inside the school. BSD says that this omission was immaterial because the footage from Camera 8, located inside a wiring closet, was irrelevant. At time the court made its sanctions ruling, BSD had not yet explained Camera 8's location and field of view. Thus, the court did not abuse its discretion by noting this misinformation. But given Camera 8's placement, the misinformation does not suffice as a basis for sanctions.

responds by noting that Division Two of this court rejected the same argument in an unpublished case and saying, even if Jones articulates a new standard, BSD's conduct would meet it. We conclude the court applied the correct standard for willfulness.

Our Supreme Court held in Magaña that "'[a] party's disregard of a court order without reasonable excuse or justification is deemed willful.'" 167 Wn.2d at 584 (quoting Rivers v. Wash. State Conf. of Mason Contractors, 145 Wn.2d 674, 686–87, 41 P.3d 1175 (2002)). The court later clarified that willfulness is not established by the mere fact of a violation of a court order or discovery rule. Blair v. TA-Seattle E. No. 176, 171 Wn.2d 342, 350 n.3, 245 P.3d 797 (2011). And in Jones, our Supreme Court—referring to Blair[19]—said,

> This court has held that a party's failure to comply with a court order will be deemed willful if it occurs without reasonable justification. It has more recently noted, however, that Burnet's willfulness prong would serve no purpose "if willfulness follows necessarily from the violation of a discovery order." Something more is needed.

179 Wn.2d at 345 (citations omitted). Jones did not define what "[s]omething more" is nor did it apply this standard.[20]

---

[19] 171 Wn.2d at 350 n.3.

[20] In an unpublished opinion, Division Two of this court rejected the same argument BSD makes here. TrueBlue, Inc. v. Marchel, No. 52665-4-II, slip op. at 22 (Wash. Ct. App. Jun. 2, 2020) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2052665-4-II%20Unpublished%20Opinion.pdf. ("We disagree that Jones repudiated the Magaña rule for willfulness in this brief comment. And the court in Jones did not in fact apply this 'something more' rule. [T]he court reversed because the superior court did not explicitly or implicitly conduct a willfulness inquiry at all."), review denied, 196 Wn.2d 1032, 478 P.3d 82 (2021); see GR 14.1(c). We have held that "Jones disavowed the usual presumption that violating a rule constitutes a willful act, holding instead that willfulness must be demonstrated." Farrow v. Alfa Laval, Inc., 179 Wn. App. 652, 664 n.8, 319 P.3d 861 (2014).

29

The trial court cited the Magaña standard for willfulness. 167 Wn.2d at 584 ("A party's disregard of a court order without reasonable excuse or justification is deemed willful."). But then—quoting Blair, the same case the Jones court cited—it explained that willfulness cannot automatically be presumed from a discovery violation. Noting BSD's failure to comply with its own record retention policy, delay in disclosing the destruction of the footage, continued pattern of discovery violations over two years, and lack of any adequate explanation for its conduct, the trial court concluded that BSD's actions were willful. Neither Jones nor Blair establishes that those considerations do not amount to the "[s]omething more" needed to establish willfulness.[21] The trial court did not err.

> b. The trial court acted within its discretion by concluding BSD's conduct substantially prejudiced J.K.

BSD says it did not substantially prejudice J.K.'s ability to prepare for trial. It contends that the footage from Cameras 5–8 was irrelevant and the footage from the bus was likely irrelevant so the footage would not have mattered in J.K.'s trial preparation. J.K. responds that the footage was potentially important and BSD's act of reviewing the footage and destroying it placed J.K. at a significant investigatory disadvantage. J.K. also highlights BSD's discovery

---

[21] In an unpublished post-Jones opinion, we affirmed a willfulness finding when the sanctioned party failed to provide a reasonable excuse for their discovery violation. See, e.g., Crews v. Avco Corp, No. 70756-6-I, slip op at 16 (Wash. Ct. App. Apr. 6, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/707566.pdf. ("it was not an abuse for the court to conclude that Avco did not provide a reasonable excuse for its nonproduction. Therefore, the trial court did not abuse its discretion in finding that the violation of the discovery order was willful."); see GR 14.1(c).

violations. We conclude that the trial court acted within its discretion in concluding that BSD's conduct substantially prejudiced J.K.

"This prong of the test looks to whether [a party] was prejudiced in *preparing* for trial, not *obtaining* a fair trial." Magaña, 167 Wn.2d at 589.

In addressing prejudice, the trial court emphasized its prior findings that BSD's conduct placed J.K. at a serious investigative disadvantage in conducting discovery and concluded that it caused J.K. substantial prejudice. It concluded that BSD's intentional destruction of evidence undermined the fact finder's ability to render a verdict based on the evidence, disrupted the evidentiary balance necessary for the accuracy of the fact-finding process, and threatened the "orderly administration of justice." It noted that it was because of BSD's misconduct that J.K. did not know how many video files were missing or what the footage would have shown.

We determine that the trial court acted within its discretion in concluding that BSD's failure to preserve potentially important video footage and its repeated discovery violations substantially prejudiced J.K.'s ability to prepare for trial. J.K. never had a chance to review the destroyed video footage. His legal team could not determine whether the footage corroborated the allegations of abuse, whether it showed inadequate supervision, or if it could be used to identify potential witnesses. See Smith v. Behr Process Corp., 113 Wn. App. 306, 325, 327, 54 P.3d 665 (2002) (affirming a default judgment where the trial court found substantial prejudice when the defendant's failure to disclose information prevented the plaintiffs from "follow[ing] up on leads from developed facts").

31

Compounding the effects of the spoliation, BSD's untimely, evasive, incomplete, and misleading discovery responses affected J.K.'s ability to prepare for trial. For instance, because BSD did not produce the e-mail exchange between Lesco and Roberts about video software until August 2019, J.K. seemingly did not know to question Lesco about whether he reviewed footage during his deposition in January 2019. The trial court acted within its discretion in concluding that BSD's conduct substantially prejudiced J.K.

### c. The trial court acted within its discretion in considering and rejecting lesser sanctions

BSD says that the sanctions imposed here were too harsh and that the trial court erred by declining to impose lesser sanctions. We conclude that the trial court acted within its discretion in considering and rejecting lesser sanctions.

"The discovery sanction should be proportional to the discovery violation and the circumstances of the case." Magaña, 167 Wn.2d at 590. Before ordering a default judgment, a trial court must "'clearly indicate on the record that it has considered less harsh sanctions.'" Id. (quoting Rivers, 145 Wn.2d at 696). A trial court should impose the "'least severe sanction that will be adequate to serve the purpose of the particular sanction.'" Id. (quoting Fisons, 122 Wn.2d at 355–56). But a sanction "'must not be so minimal, however, that it undermines the purpose of discovery.'" Id. (quoting Fisons, 122 Wn.2d at 355–56). "'The sanction should insure [sic] that the wrongdoer does not profit from the wrong.'" Id. (quoting Fisons, 122 Wn.2d at 355–56).

The trial court considered multiple possible sanctions and determined that anything less than the sanctions imposed would not adequately address the goals of deterrence, punishment, compensation, and education. It concluded that continuing the trial would not be productive given that the destroyed footage could not be retrieved. And it concluded that imposing a monetary fine would be unsatisfactory because it would be difficult to determine an appropriate amount for an entire school system and a fine would not address the prejudice J.K. and the judicial system suffered. It concluded that striking BSD's affirmative defenses would be insufficient because J.K. would still have to prove liability but without the benefit of the destroyed footage. It also concluded that an adverse inference instruction directing jurors to apply a rebuttable presumption against BSD would not provide a sufficient punishment for, and deterrence against, evidence destruction and would distract the jury from the merits of J.K.'s claims by having it focus on whether BSD successfully overcame the presumption.

BSD says that the trial court's sanctions were not proportional to the discovery violations and the circumstances of the case. It contends that its violations were merely failing to preserve irrelevant footage and providing discovery responses before the discovery cutoff date, although after discovery deadlines. Thus, it contends, the harsh sanction of a default judgment is disproportional. But BSD downplays its violations. And the trial court thoroughly explained why lesser sanctions were inadequate to attain the goals of deterrence, punishment, compensation, and education. Given the spoliation and later discovery violations, which made it difficult for J.K. to uncover the spoliation,

the trial court acted within its discretion by determining that a harsher punishment was proportional to the violations. And the trial court acted within its discretion by concluding that imposing a lesser sanction than default judgment would not provide enough deterrence for those who may destroy potentially damaging evidence. We conclude that the trial court properly considered lesser sanctions before imposing a default judgment on liability.[22]

BSD says the trial court incorrectly concluded that an adverse-inference instruction would distract the jury from the merits of J.K.'s claims by making it focus on whether BSD successfully rebutted the adverse inference. BSD contends that such an instruction would simply make it easier for J.K. to prove the merits of his case. BSD is correct that such an instruction would make J.K.'s case easier. But the trial court also rejected the adverse-inference instruction because it would not sufficiently punish BSD nor provide sufficient deterrence against evidence destruction. BSD contends that the punishment is

---

[22] BSD contends that the combination of the default judgment on liability, exclusion of experts, and award of costs and fees made the sanctions too severe. But BSD focuses mainly on the default judgment. We do not address whether the exclusion of experts and award of costs were proper individually because BSD does not challenge those sanctions individually. BSD cites no law saying that the combination of a default judgment with the exclusion of an expert witness and the award of costs and fees goes "too far," nor does it provide more than a conclusory statement to that effect. See Prostov v. Dep't of Licensing, 186 Wn. App. 795, 823, 349 P.3d 874 (2015) ("The failure of an appellant to provide argument and citation of authority in support of an assignment of error precludes appellate consideration of an alleged error."). The sanctions taken as a whole were within the trial court's discretion. See Magaña, 167 Wn.2d at 582 (noting that trial courts exercise "'broad discretion'" in imposing discovery sanctions (quoting Mayer, 156 Wn.2d at 684)); cf. Turner v. Vaughn, No. 54010-0-II, slip op. at 32 (Wash. Ct. App. Jul. 7, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2054010-0-II%20Unpublished%20Opinion.pdf. (affirming trial court's imposition of a default judgment and exclusion of witness testimony and exhibits).

disproportionate to its violations, which it characterizes as a failure to preserve irrelevant footage and to disclose that failure to preserve promptly. But as mentioned above we disagree with its characterization. The trial court acted within its discretion by rejecting an adverse-inference instruction.

BSD also says the trial court incorrectly concluded that striking BSD's affirmative defenses would be insufficient because J.K. would still be forced to litigate the liability issue without the benefit of the footage. BSD says this is so because the footage was irrelevant. But again, the footage was potentially important or relevant. The trial court acted within its discretion by rejecting the striking of BSD's affirmative defenses.

BSD says the trial court's sanctions were particularly harsh because it did not simply instruct the jury that BSD was liable, and instead gave a series of instructions on unproven facts.[23] But once a sanction is warranted, the trial court has discretion in fashioning a sanction. See Magaña, 167 Wn.2d at 582. These instructions constituted a default judgment on the liability issue, and the Burnet factors support a default judgment.

D. Attorney Fees

J.K. requests attorney fees on appeal under CR 37(b). Under RAP 18.1 if applicable law provides a party with the right to recover attorney fees on appeal, we may consider a request for such fees. Under CR 37(d)(3), in cases of

---

[23] J.K. responds by conducting an analysis on whether the instructions themselves require reversal. But this somewhat misconstrues BSD's argument; BSD contends that the sanction, as delivered through the jury instruction, was too harsh. It does not contend the instructions were otherwise misleading or incorrect. Thus, we do not address J.K.'s contentions on this issue.

discovery order violations, the trial court "shall require the party failing to act or the attorney advising the party or both to pay the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust." The court in Magaña held that the party who successfully defended a sanctions appeal was entitled to attorney fees on appeal under RAP 18.1 and CR 37(d). 167 Wn.2d at 593. Because we affirm the trial court's sanctions order, we award J.K. reasonable attorney fees on appeal subject to compliance with RAP 18.1(d).

We affirm.

_____
Chun, J.

WE CONCUR:

_____          _____
                                         Appelwick, J.