# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JASON BUCKHOLTZ as Personal Representative for the Estate of DENNIS G. WOODRUFF, | No. 56257-0-II |
| Respondent, | |
| v. | |
| AMERICAN OPTICAL CORPORATION; CROWN CORK & SEAL COMPANY, INC.; METROPOLITAN LIFE INSURANCE COMPANY; NORTH COAST ELECTRIC COMPANY; PFIZER, INC.; UNION CARBIDE CORPORATION; WEYERHAEUSER COMPANY, individually and as successor-in interest to WILLAMETTE INDUSTRIES, INC., R.-W PAPER COMPANY and WESTERN KRAFT; WEYERHAEUSER NR COMPANY; ZIDELL MARINE CORPORATION; ZIDELL DISMANTLING, INC.; PON NORTH AMERICA, INC., individually and as successor to ZIDELL VALVE CORPORATION; GENERAL ELECTRIC COMPANY; GOULDS PUMPS (IPG), LLC; IMO INDUSTRIES, INC., individually and as successor-in interest to DE LAVAL TURBINE, INC.; ITT LLC, as successor-in interest to FOSTER VALVES; VIACOMCBS, INC.; WARREN PUMPS, LLC, individually and as successor-in interest to QUIMBY PUMP COMPANY; and THE PORT OF TACOMA, | UNPUBLISHED OPINION |
| Defendants, | |
| ZIDELL EXPLORATIONS, INC., | |
| Appellant. | |

MAXA, J. – Zidell Explorations Inc. appeals an $11.2 million judgment in favor of Dennis Woodruff following a jury verdict. Woodruff's lawsuit arose from his exposure to asbestos in the early 1970s while working dismantling ships as an employee of Zidell Dismantling Inc., a related but separate corporation from Zidell Explorations.[1]

Woodruff's liability theory was that Zidell Explorations owed him a general duty of care because it owned at least one and possibly more of the ships that Zidell Dismantling dismantled. Woodruff also claimed that Zidell Explorations was liable because it was the guarantor of Zidell Dismantling's lease with the Port of Tacoma, which required Zidell Dismantling to comply with all safety regulations. Zidell Explorations filed motions for judgment as a matter of law under CR 50(a) and (b), arguing that it owed no duty to Woodruff even if it did own the ships and despite the lease guarantee. The trial court denied the motions. Zidell Explorations appeals the denial of its CR 50 motions.

In 2017, Zidell Dismantling destroyed a number of documents that Woodruff claimed must have included records showing whether Zidell Explorations owned some of the ships that Zidell Dismantling dismantled. The trial court concluded that this destruction of documents constituted spoliation of evidence, and as a sanction instructed the jury that it could infer that the ship-ownership records would have been unfavorable to Zidell Explorations. Zidell Explorations appeals the trial court's conclusion that spoliation occurred and challenges the language of the adverse inference instruction.

We hold that (1) Zidell Explorations owed a duty to Woodruff as an owner of at least one of the ships on which Woodruff worked but not as a guarantor on Zidell Dismantling's lease with

---

[1] Woodruff passed away while this appeal was pending, and Jason Buckholtz as personal representative of Woodruff's estate has been substituted as the respondent. The opinion will continue to refer to the respondent as Woodruff.

the Port of Tacoma, and (2) the trial court erred in concluding that Zidell Explorations engaged in spoliation of evidence. Accordingly, we remand for the trial court to vacate the judgment entered against Zidell Explorations and for a new trial.

FACTS

*Background*

Zidell Explorations was formed in 1912. The company's headquarters were in Portland, Oregon. Zidell Explorations began dismantling decommissioned Navy ships in Portland in the 1950s.

Zidell Dismantling was formed in 1960. Zidell Dismantling performed ship dismantling operations in Tacoma. The two companies had common owners and officers, but they were operated and maintained as separate corporations. Emery Zidell was the president and part owner of both companies in the early 1970s. The two companies' operations were very similar, and they coordinated some of their activities. They also placed joint advertisements for selling and buying vessels and their parts.

Zidell Dismantling entered into a lease with the Port of Tacoma, which stated that "Tenant agrees to keep said premises in a clean and safe condition and to comply with all police, sanitary or safety laws and all applicable regulations or ordinances of all governmental bodies having authority over said premises." Ex. 123 at 33. The lease was signed by Emery Zidell. Below the lease signature line was the following provision: "The undersigned here jointly and severally guarantee compliance with all of the provisions of the foregoing Lease and Rental Agreement." Ex. 123 at 34. Emery Zidell signed this guarantee on behalf of Zidell Explorations, as did another entity whose name is illegible.

In 1981, Zidell Dismantling stopped dismantling ships and was renamed Zidell Marine Corporation. For clarity, we will refer to this company as Zidell Dismantling despite the name change. And in 1997, Zidell Explorations was sold and merged into a different company.

Woodruff worked for Zidell Dismantling from May 10, 1970 to July 17, 1973. He first worked as a burner for 14 months. His job was to use large torches to carve up parts of the ships into smaller sections. Part of being a burner included removing asbestos insulation material from pipes and placing it on the pier. But Woodruff never worked aboard the ships as a burner, only on the back lot where the scrap and debris piles ended up. Woodruff then worked as a laborer. Laborers would do any general labor that was needed throughout the job site, including working on the ships being dismantled. Woodruff testified that he was exposed to asbestos during his time at Zidell Dismantling.

One ship that Woodruff worked on as a laborer was the USS Philippine Sea. There was evidence that Zidell Explorations owned this ship, and it was sent to Tacoma to begin the dismantling process. Dismantling began on April 4, 1971, and on July 19, 1971 the ship was moved to Portland for Zidell Explorations to complete the dismantling.

During his years working at Zidell Dismantling, Woodruff was not warned about the hazards of asbestos by anyone at Zidell Dismantling, Zidell Explorations, or the Port of Tacoma. Nor were there any signs on board the ships being dismantled warning workers about asbestos.

In August 2020, Woodruff started experiencing symptoms and was diagnosed with mesothelioma from being exposed to asbestos.

*Woodruff Lawsuit*

Woodruff subsequently filed a lawsuit against a number of parties, including Zidell Dismantling, Zidell Explorations, and the Port of Tacoma. Woodruff later dismissed Zidell

Dismantling from the lawsuit because he was barred from suing his employer under the Industrial Insurance Act, RCW 51.04.010, and there was no evidence that the case fell within the deliberate injury exception in RCW 51.24.020.

Woodruff eventually settled with all other defendants except Zidell Explorations and the Port of Tacoma.

*Discovery and Motion for Sanctions*

In response to discovery, Zidell Dismantling produced a list of ships Zidell Dismantling dismantled between 1970 and 1974. Zidell Dismantling supplemented this answer with a list of ships that were worked on by Zidell Explorations in Portland, which included the USS Philippine Sea. The trial court referred to these documents as "the ship lists." Clerk's Papers (CP) at 4624. The ship lists contained specific information regarding each ship, including the ship name and type, purchase price, declared value, arrival date, when work began and ended, and notes. The ship lists did not state which entity owned the ships.

William Gobel, the vice president and chief operating officer of Zidell Dismantling, testified as a CR 30(b)(6) designee for both Zidell Dismantling and Zidell Explorations. When testifying on behalf of Zidell Explorations, Gobel testified as follows:

> Q: Is it the testimony of Zidell Explorations that the company does not know whether it paid any portion of the purchase price listed here in Exhibit 11 for the Philippine Sea?
>
> A: The only thing I know is when the work was done in Tacoma it was owned by Zidell Dismantling. Everything that we dismantled in Tacoma was owned by Zidell Dismantling.

CP at 1653-54.

Kathryn Silva, Zidell Dismantling's general counsel, certified both Zidell Dismantling's and Zidell Explorations' discovery responses. Woodruff deposed Silva, and she testified that all

of the discovery responses were accurate and complete. But two hours after Silva's deposition ended, Zidell Explorations sent Woodruff a letter attaching a document regarding a 1969 special meeting of Zidell Dismantling's board of directors. The document stated, "[T]he Directors discussed and determined that purchase of vessels for dismantling would thereafter be made by ZIDELL DISMANTLING, INC. rather than by ZIDELL EXPLORATIONS, INC." CP at 1680. The trial court referred to this document as the "board meeting document." CP at 4623.

Woodruff then filed a motion for CR 37 discovery sanctions primarily based on Zidell Explorations' failure to timely produce the board meeting document. Woodruff argued that this document was evidence that Zidell Explorations owned at least some of the ships that were salvaged at Zidell Dismantling. Woodruff requested as a sanction that the fact that he was exposed to asbestos on ships Zidell Explorations owned be taken as established under CR 37(b)(2)(A).

While the motion was pending, the trial court authorized another deposition of Silva. Silva testified about historical litigation involving Zidell entities. In 1997, Zidell Explorations and other Zidell entities filed a lawsuit in Oregon against its insurers seeking insurance coverage for environmental liability arising over its dismantling activities in Portland. That lawsuit was mostly settled by 2000. In 2002, Zidell Dismantling filed a lawsuit in Washington seeking insurance coverage for environmental liability arising over its dismantling activities in Tacoma. And before 1997, Zidell Valves, a division of Zidell Explorations, had been sued for injuries resulting from asbestos exposure.

Silva also testified that both Zidell Explorations and Zidell Dismantling knew as early as the 1990s that its dismantling sites were going to be the subject of prolonged environmental

6

cleanup litigation. It took approximately 10 years to reach a consent decree in the Tacoma environmental litigation.

Silva testified about the creation of the ship lists. She stated that they were prepared by outside counsel in the 1997 Oregon insurance coverage litigation. She acknowledged that the information on the ship lists could have been obtained only from company records. Silva did not know if those records showed who purchased the ships being dismantled. In fact, she had no knowledge of what records were used to create the ship lists. And she did not know what happened to those records. However, she did know that whatever records were used to create the ship lists no longer existed.

In 2017, records from the Zidell entities that were kept in a storage facility were moved to a new storage facility. In conjunction with this move, a number of documents were destroyed. Silva could not say how many documents were destroyed, whether it was 10 percent or 90 percent of the documents at the facility. Silva personally authorized the destruction of approximately 20 boxes of "very old" litigation material from the 1970s. The litigation related to Zidell's tube forgings company, some anti-dumping litigation, and company shareholder litigation. Silva did not review these documents before destroying them. And these documents were not digitized before they were destroyed.

Silva provided the following testimony regarding the duty to retain documents:

Q. Okay. As an attorney, you're aware of the need to retain documents potentially relevant in litigation; correct?

A. Yes.

Q. Okay. And as an attorney, you understand that retention of documents potentially relevant to litigation is a duty that attaches even before said lit -- even before a particular piece of litigation is commenced; correct?

A. Yes.

CP at 2012. She later testified that Zidell Dismantling was obligated to retain documents "if there is any known litigation or potential litigation." CP at 2111. And earlier she had testified there was no litigation or potential litigation in 2017 when the documents were destroyed.

After Silva's deposition, Woodruff raised an issue regarding potential spoliation of documents relating to the ship lists. Woodruff supplemented his sanction motion with excerpts from Silva's second deposition and case authority regarding spoliation. The trial court took the motion for sanctions under advisement and stated that it would issue a ruling at a later time.

*Discovery Sanction and Spoliation Ruling*

At the beginning of the trial, the trial court ruled that Zidell Explorations had engaged in spoliation of evidence regarding the documents relating to the board meeting document and the ship lists. The court determined that the records destroyed were relevant to a claim or defense, Zidell Exploration was obligated to preserve the records because they were relevant to anticipated litigation, and there was a conscious disregard of discovery violations because the documents were not scanned before they were destroyed. The court decided that an adverse inference instruction was the appropriate remedy.

The trial court later entered an order regarding discovery sanctions, including extensive findings of fact and conclusions of law. The court made a finding of fact that included in the documents destroyed in 2017 "were all of the records upon which the ship lists were based." CP at 4627. The court also made the following findings:

> 16. The Court takes judicial notice of the fact that, as of 2017, the common course of business for most corporations in the country would be to digitize historic business records prior to their destruction. Doing so allows the corporation to keep the records in an electronic fashion and to even convert them into a searchable format.

17. When Zidell authorized the destruction of historic business records in 2017, it did not digitize any of the destroyed documents first. It is entirely unexplained why this did not occur, but the Court finds this fact to be especially remarkable, even stunning.

CP at 4627.

The court concluded that Zidell Explorations "consciously disregarded its discovery obligations, and that spoliation has occurred." CP at 4629. The court stated, "[T]he spoliation relates to documents underpinning the ship lists. The ship lists, in turn, go to the weight of Zidell Explorations' defense that the ships dismantled in Tacoma would have been owned by Zidell Dismantling." CP at 4631.

The trial court entered the following conclusion of law:

Zidell committed spoliation for its destruction of historic business records in 2017 potentially relevant to anticipated future toxic tort litigation. First, there is no doubt that the destroyed documents, which served as the underpinnings of the Board Meeting document and the ship lists, were relevant to a claim or defense. Indeed, it is Zidell's entire defense in this case. Second, by Silva's own admission, Zidell clearly understood that it had a duty to preserve these documents as evidence. Moreover, the Court concludes that Zidell should reasonably have known that the evidence might have been relevant to anticipated litigation. Apart from the environmental litigation, Zidell Valves had been sued for asbestos exposure in the past. Thus, these destroyed documents were highly relevant to litigation that Zidell reasonably should have anticipated would arise in the future.

CP at 4632.

With regard to Zidell Explorations' culpable state of mind, the court also took "judicial notice that most companies scanned all of their historical documents once the technology became available." CP at 4632. The court concluded,

Because Zidell knew or should have known that it was going to continue to be involved in litigation arising from its ship dismantling operations – including asbestos litigation – yet did not take the very simple step of digitizing those documents before they were destroyed, the Court concludes that there was a culpable state of mind and a conscious disregard of Zidell's legal obligation to preserve documents reasonably anticipated to be relevant in future litigation.

CP at 4632.

As a sanction, the trial court determined that it would "give an adverse inference instruction to ameliorate the prejudice to [Woodruff] resulting from Zidell's authorization of destruction of historic business records regarding ownership of the ships scrapped at Zidell Dismantling facility during Mr. Woodruff's employment there." CP at 4633. The court also ordered Zidell Explorations to pay Woodruff's attorney fees and costs and imposed an additional sanction of $15,000.

*Trial Testimony*

At trial, evidence was presented regarding the background information recited above regarding Zidell Explorations, Zidell Dismantling, and Woodruff's work for Zidell Dismantling.

Gobel worked for the family of Zidell companies for 61 years. He worked summers for Zidell Explorations in Portland, and started at Zidell Dismantling in Tacoma in 1960 as a laborer. Gobel stated that Zidell Explorations and Zidell Dismantling were separate companies. However, he acknowledged that both companies were a part of the "Zidell organization" and that Emery Zidell was the president of the "organization." Report of Proceedings (RP) at 466. He also acknowledged that the interrogatory answers and trial exhibits showed that Zidell Explorations and Zidell Dismantling had common owners and directors.

Gobel stated that with the exception of one person, all the officers and directors of Zidell Dismantling had their offices at Zidell Explorations' facility in Portland. However, Emery Zidell and other officers occasionally would visit Zidell Dismantling's operations in Tacoma.

Gobel testified that the dismantling process for some ships would begin at Zidell Dismantling and then would finish at Zidell Explorations in Portland. One of the ships for which this occurred was the USS Philippine Sea. Gobel had a personal recollection of this fact.

10

Regarding the USS Philippine Sea, Gobel was present when the ship was being worked on by Zidell Dismantling. The reason the ship was sent to Tacoma was that it was too tall to fit under the bridges on the way to Zidell Explorations' facility in Portland. Therefore, the ship's tower and offices on the deck were removed in Tacoma. The wood decking on the ship also was removed. Once that work was complete, the ship was towed to Portland because it was now short enough to get under the bridges. The removal of the metal components, insulation, and equipment was done in Portland. Gobel did not know whether he observed anything regarding asbestos on that ship.

Gobel testified that Zidell Explorations had no documents regarding the title of any ships or the purchase of any ships for the time period of 1970 to 1974. But the cruise book from the USS Philippine Sea stated that the USS Philippine Sea was sold to Zidell Explorations in March 1971. Further testimony revealed that the USS Philippine Sea appeared in a July 15, 1971 edition of the Maritime Reporter. Zidell Explorations' logo appeared on the top of the publication, although at the time the USS Philippine Sea was being dismantled in Tacoma. Zidell Explorations was advertising that it was dismantling the USS Philippine Sea and another aircraft carriers. The advertisements showcased various pieces of salvaged material from the USS Philippine Sea.

Woodruff testified that he spent "maybe five months" working on the USS Philippine Sea, and at least it "felt like a long time." RP at 425. However, Zidell Explorations presented evidence that Woodruff started working at Zidell Distributing on May 10, 1970 and worked as a burner for 14 months before working on ships as a laborer. The USS Philippine Sea left Zidell Dismantling on July 19, 1971. Therefore, there was evidence that Woodruff's time as a laborer –

when he worked on the ships – overlapped with the ship's presence at Zidell Dismantling only by approximately nine days.

Gobel testified that Zidell Explorations knew that there was asbestos on the Navy ships that it owned and that asbestos was hazardous to human health. Gobel saw no evidence that Zidell Explorations ever warned Woodruff of this danger.

Environmental studies and surveys performed decades later on the Zidell Dismantling site in Tacoma revealed that asbestos was common throughout the site.

*CR 50(a) Motion*

At the close of evidence, Zidell Explorations filed a motion for judgment as a matter of law under CR 50(a). Zidell Explorations argued that Woodruff had presented no evidence showing that it owed a duty to him. Specifically, Zidell Explorations argued that even if it owned at least one of the ships on which Woodruff worked, it was not subject to premises liability or jobsite owner liability and there was no other basis for finding a duty.

The trial court denied Zidell Explorations' CR 50(a) motion.

*Adverse Inference Instruction*

The trial court prepared an adverse inference instruction pursuant to its spoliation ruling, identified as instruction 30. The instruction was based on the missing witness instruction stated in WPIC 5.20.[2] The adverse inference instruction that the trial court gave the jury stated in part:

> You have heard evidence that Zidell Explorations destroyed business records relating to the ownership of Navy ships dismantled by Zidell Dismantling between 1970 through 1973. When business records are destroyed by a party prior to trial, you may infer that the records would have been unfavorable to the party destroying the records.

---

[2] 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS CRIMINAL: 5.20 (4th ed. 2016).

CP at 4592.  Zidell objected to the language of this instruction.

*Closing Argument*

In closing argument, Woodruff emphasized the adverse inference instruction in arguing

that Zidell Explorations owned all the ships that Zidell Dismantling salvaged in Tacoma.

> [Y]ou may infer, if those documents were destroyed by Kathryn Silva in 2017, that on the issue of ship ownership, that it would be unfavorable to Zidell Explorations, meaning that it would confirm what the documents we do have show.  That Zidell Explorations owned the ships that were being dismantled in Tacoma, Washington, when Dennis Woodruff worked there.

RP at 1251.

> On rebuttal, Woodruff stated,

> And Zidell Explorations absolutely owned those ships.  Why?  We are accused of only bringing documents for the Philippine Sea because Zidell Explorations threw away all the other documents, not because of the passage of time, but because of a deliberate decision that they made in 2017. Facing environmental litigation regarding asbestos and knowing about asbestos claims, they threw those documents away.  So it's reasonable for you to infer that those ships that were at the shipyard -- and not just the Philippine Sea -- were owned by Zidell Explorations.  That is a fact.

RP at 1355.

> Zidell Explorations owned the asbestos-containing ships, not just the Philippine Sea, but the other ships that were coming up here to Tacoma to be dismantled.  And how can you conclude that?  Based on the inference that you can draw from the documents we do have and the fact that Zidell Explorations threw the documents away in 2017.

RP at 1361.

*Jury Verdict and CR 50(b) Motion*

The jury found that both Zidell Explorations and the Port of Tacoma were negligent, but

found that only Zidell Explorations' negligence was a substantial factor in causing Woodruff's

injuries.  The jury also found that Woodruff was not contributorily negligent.  The jury awarded

Woodruff $216,056 in agreed past medical expenses and $11 million in noneconomic damages.

13

The trial court entered judgment against Zidell in the amount of $9,448,556, reflecting a reduction for the prior settlements.

Zidell Explorations subsequently filed a motion for judgment as a matter of law under CR 50(b), or in the alternative for a new trial or remittitur. Zidell Explorations again argued that Woodruff had failed to establish that it owed him a duty and noted that its guarantee of Zidell Dismantling's lease did not create a duty. The trial court denied Zidell Explorations' CR 50(a) motion.

Zidell Explorations appeals the trial court's denial of its CR 50 motions and the trial court's sanction based on spoliation of evidence.

ANALYSIS

A.    EXISTENCE OF A DUTY

Zidell Explorations argues that the trial court erred in denying its CR 50(a) and (b) motions for judgment as a matter of law because Woodruff did not establish that Zidell Explorations owed him a duty. Zidell Explorations claims that it owed no duty to Woodruff as the owner of the worksite on which Woodruff worked and that it did not assume a duty by guaranteeing Zidell Dismantling's lease. We conclude that Zidell Explorations owed Woodruff a duty of ordinary care as the owner of ship or ships on which Woodruff worked, but not as a lease guarantor.

1.    Standard of Review

Under CR 50(a)(1), a court may grant judgment as a matter of law on an issue if "there is no legally sufficient evidentiary basis for a reasonable jury to find or have found for [the nonmoving] party with respect to that issue." This motion may be filed "any time before

14

submission of the case to the jury." CR 50(a)(2). Under CR 50(b), a party may renew the motion for judgment as a matter of law after judgment has been entered.

A CR 50 motion can be granted " 'only when, after viewing the evidence in the light most favorable to the nonmoving party, there is no substantial evidence or reasonable inferences therefrom to support a verdict for the nonmoving party.' " *Mancini v. City of Tacoma*, 196 Wn.2d 864, 877, 479 P.3d 656 (2021) (quoting *H.B.H. v. State*, 192 Wn.2d 154, 162, 429 P.3d 484 (2018)). Substantial evidence is evidence sufficient to persuade a fair-minded, rational person that the declared premise is true. *Id.* We review a trial court's CR 50 decision de novo. *Id.*

### 2. Legal Principles

The threshold determination in a negligence claim is the existence of a duty – whether the defendant owed the plaintiff a duty. *Turner v. Dep't of Soc. & Health Servs.*, 198 Wn.2d 273, 284, 493 P.3d 117 (2021). The existence of a duty is a question of law that we review de novo. *Id.*

In general, a duty is an obligation of one person to conform to a particular standard of conduct toward another person. *Mita v. Guardsmark, LLC*, 182 Wn. App. 76, 83, 328 P.3d 96 (2014). Whether a legal duty exists depends on " 'considerations of logic, common sense, justice, policy, and precedent.' " *Volk v. DeMeerleer*, 187 Wn.2d 241, 266, 386 P.3d 254 (2016) (quoting *Affil. FM Ins. Co. v. LTK Consulting Servs., Inc.*, 170 Wn.2d 442, 449, 243 P.3d 521 (2010) (plurality opinion)). " 'The concept of duty is a reflection of all those considerations of public policy which lead the law to conclude that a plaintiff's interests are entitled to legal protection against the defendant's conduct.' " *Volk*, 187 Wn.2d at 266 (quoting *Affil. FM*, 170 Wn.2d at 450).

The issue here is whether the owner of a decommissioned ship that contains asbestos owes a duty to exercise ordinary care to warn or protect the employee of a company that is dismantling the ship.

3.    Jobsite Owner Duty

Zidell argues that it owed Woodruff no common law or statutory duty as the owner of the ship[s] on which Woodruff was working.  We disagree.

a.    Legal Principles

A worksite owner's duty is determined with reference to a general contractor's duty. "Under the common law, a general contractor owes a duty to all employees on a jobsite to provide a safe place to work in all areas under its supervision."  *Vargas v. Inland Wash., LLC,* 194 Wn.2d 720, 731, 452 P.3d 1205 (2019).  Despite this rule, a general contractor on a worksite who hires an independent contractor to perform certain work generally is not liable for injuries to the employees of that independent contractor.  *Id.*  But if a general contractor hires a subcontractor and retains control over the work performed, the general contractor has a duty within the scope of control to provide a safe work place.  *Id.*

For purposes of this rule, " '[t]he test of control is not the actual interference with the work of the subcontractor, but the right to exercise such control.' "  *Id.* (quoting *Kelley v. Howard S. Wright Constr. Co.*, 90 Wn.2d 323, 330-31,582 P.2d 500 (1978)).  Stated differently, "the proper inquiry becomes whether there is a retention of the right to direct the manner in which the work is performed, not simply whether there is an actual exercise of control over the manner in which the work is performed."  *Kamla v. Space Needle Corp.*, 147 Wn.2d 114, 123, 125, 52 P.3d 472 (2002).

In addition to the common law duty, a general contractor may have a statutory duty to provide a safe work place.[3] *Vargas*, 194 Wn.2d at 735. This statutory duty applies regardless of whether the general contractor retains control over the worksite. *Id.* at 736.

There is no suggestion in the record that Zidell Explorations acted as a general contractor here. But to the extent that Zidell Explorations owned the USS Philippine Sea and possibly other ships that Zidell Dismantling dismantled, Zidell Explorations was the owner of the worksite where Woodruff worked and was exposed to asbestos. This ownership potentially gives rise to a duty of care to workers at the worksite:

> Under some circumstances, jobsite owners may have a duty of care analogous to that of an employer or general contractor. . . . A jobsite owner or general contractor will have this duty only if it maintains a sufficient degree of control over the work. . . . If the general contractor – or by extension, jobsite owner – *has the right to exercise control*, it also "has a duty, within the scope of that control, to provide a safe place of work."

*Afoa v. Port of Seattle*, 191 Wn.2d 110, 121, 421 P.3d 903 (2018) (emphasis added) (quoting *Kelley*, 90 Wn.2d at 330).

### b. Duty Analysis

There is no evidence here that Zidell Explorations actually exercised control over how Zidell Dismantling performed work on the USS Philippine Sea and possibly other ships that Zidell Explorations owned. The issue is retained control – whether Zidell Explorations retained the *right* to exercise control. *Afoa*, 191 Wn.2d at 121.

Here, the nature of the relationship between the two companies shows that Zidell Explorations had the right to control Zidell Dismantling's work on the ships that Zidell

---

[3] Currently, the Washington Industrial Safety and Health Act of 1973 (WISHA), ch. 49.17 RCW creates this statutory duty. *Vargas*, 194 Wn.2d at 735. Woodruff was employed at Zidell Dismantling until July 17, 1973, and WISHA took effect on March 9, 1973.

Explorations owned. Zidell Explorations and Zidell Dismantling had common owners and directors, and Emery Zidell was the president of both companies. Both companies were part of the "Zidell organization," headed by Emery Zidell. In addition, Zidell Explorations clearly was the dominant company in the Zidell organization. All the common directors and officers but one had offices at Zidell Explorations' facility in Portland. This relationship compels the conclusion that Zidell Explorations had the ability to direct the manner in which Zidell Dismantling worked on the ships Zidell Explorations owned if Zidell Explorations had chosen to do so.

In addition, at least for the USS Philippine Sea, Zidell Explorations specifically directed what work Zidell Dismantling was to perform. Gobel testified that Zidell Explorations sent that ship to Tacoma because it was too tall to reach the Portland facility. Zidell Dismantling was not free to do whatever it wanted with the ship. Instead, Zidell Explorations directed that only the tower and offices on the main deck would be removed before the ship was sent to Portland. This fact creates an inference that Zidell Explorations retained the right to control the manner in which Zidell Distributing performed the work.

Under the unique facts of this case, we hold that Zidell Explorations owed a duty to Woodruff as the owner of one or more ships on which Woodruff worked.

4. Assumption of Duty – Lease Guarantee

Zidell argues that it did not assume a duty to comply with all safety regulations by guaranteeing Zidell Dismantling's lease with the Port of Tacoma. We agree.

The lease that Zidell Dismantling signed stated that "Tenant agrees to keep said premises in a clean and safe condition and to comply with all police, sanitary or safety laws and all applicable regulations or ordinances of all governmental bodies having authority over said

18

premises." Ex. 123 at 33. Zidell Explorations guaranteed compliance with all of the provisions the lease, jointly and severally with another entity.

"A guaranty 'arises when one assumes an obligation to pay the debt of another.' " *Serpanok Constr., Inc. v. Point Ruston, LLC*, 19 Wn. App. 2d 237, 495 P.3d 27 (2021) (quoting *Tr. of Strand v. Wel-Co Grp., Inc.*, 120 Wn. App. 828, 836, 86 P.3d 818 (2004)). A guarantee creates a contractual obligation between the guarantor and the obligee on the contract that is separate from the principal obligation. *Freestone Cap. Partners L.P. v. MKA Real Est. Opportunity Fund I, LLC*, 155 Wn. App. 643, 660-61, 230 P.3d 625 (2010). If the obligor fails to perform, the guarantor promises the obligee that it will fulfill the obligor's performance under the contract. *Century 21 Products, Inc. v. Glacier Sales*, 129 Wn.2d 406, 414, 918 P.2d 168 (1996).

Here, there is no indication that the Port of Tacoma ever invoked the guarantee and required Zidell Explorations to assume Zidell Dismantling's obligations under the lease. In addition, Woodruff cites no authority for the proposition that a guarantor can be liable *to the obligor's employee* for the obligor's failure to comply with a lease provision.

Woodruff suggests that the guarantee meant that Zidell Explorations and Zidell Dismantling had a joint obligation to comply with the lease provisions. Woodruff apparently relies on the guarantee language that "[t]he undersigned here *jointly and severally* guarantee compliance with all of the provisions of the foregoing Lease and Rental Agreement." Ex. 123 at 34 (emphasis added). However, this clause merely states that Zidell Explorations *and the other co-guarantor* had a joint obligation, not that Zidell Explorations had a joint obligation with Zidell Dismantling.

We hold that Zidell Explorations did not assume a duty to Woodruff by guaranteeing Zidell Dismantling's lease.

B.    DISCOVERY SANCTION ORDER – SPOLIATION

Zidell Explorations argues that the trial court erred in concluding that it committed spoliation of evidence.  We agree.[4]

1.    Legal Principles

We review for abuse of discretion the trial court's order of sanctions based on spoliation of evidence.  *Cook v. Tarbert Logging, Inc.*, 190 Wn. App. 448, 461, 360 P.3d 855 (2015).  An abuse of discretion occurs when the trial court was manifestly unreasonable in exercising its discretion or exercised its discretion based on untenable grounds or reasons.  *Id.*  An error of law is an untenable reason.  *Id.*  However, whether an actor has a duty to preserve evidence is a question of law that we review de novo.  *Id.*

The traditional definition of spoliation is the intentional destruction of evidence. *Henderson v. Thompson*, 200 Wn.2d 417, 441, 518 P.3d 1011 (2022).  However, whether a party has engaged in spoliation of evidence depends on an analysis of several factors.  *See Cook*, 190 Wn. App. at 461-64.

First, the person engaging in the destruction of evidence must have a duty to preserve the evidence.  *See Carroll v. Akebono Brake Corp.*, 22 Wn. App. 2d 845, 875-76, 514 P.3d 720 (2022); *Cook*, 190 Wn. App. at 462-63.  There is no general duty in Washington to preserve evidence.  *J.K. by Wolf v. Bellevue Sch. Dist. No. 405*, 20 Wn. App. 2d 291, 308, 500 P.3d 138

---

[4] Zidell Explorations in the alternative challenges the language of the trial court's adverse inference instruction, and specifically the fact that the first sentence was a comment on the evidence.  Because we hold that the trial court erred in finding spoliation, we do not address this issue.

(2021); *Cook*, 190 Wn. App. at 463-64, 470. More specifically, the cases support the argument that a potential litigant has no general duty to preserve evidence even when a person has been injured and a lawsuit is a possibility. *See Carroll*, 22 Wn. App. 2d at 876; *Cook*, 190 Wn. App. at 463.

Second, the destruction of evidence must be connected to the party subject to the sanction. *Henderson*, 200 Wn.2d at 441-42; *Cook*, 190 Wn. App. at 462. The destruction must be done by a person over whom the party had some control. *Cook*, 190 Wn. App. at 462. "We do not agree that this duty [to preserve evidence] extends to evidence over which a party has no control." *Homeworks Const., Inc. v. Wells*, 133 Wn. App. 892, 901, 138 P.3d 654 (2006).

Third, the evidence destroyed must have potential importance or relevance to the case. *Henderson*, 200 Wn.2d at 441; *J.K. by Wolf*, 20 Wn. App. 2d at 304. This factor depends upon the particular facts and circumstances of the case. *J.K. by Wolf*, 20 Wn. App. 2d at 304.

Fourth, the party destroying the evidence must have culpability – acted in bad faith or with a conscious disregard of the significance of the evidence as opposed to having an innocent explanation for the destruction. *Carroll*, 22 Wn. App. 2d at 875. Significantly, " 'a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation.' " *Id.* (quoting *Cook*, 190 Wn. App. at 464).

When spoliation occurs, the trial court may issue an adverse infe rence instruction that the missing evidence would have been unfavorable to the party at fault. *Henderson*, 200 Wn.2d at 441.

Here, Zidell Explorations challenges only a few of the trial court's findings of fact regarding spoliation. We review findings of fact to determine if substantial evidence supports them. *Real Carriage Door Co., Inc. ex rel. Rees v. Rees,* 17 Wn. App. 2d 449, 457, 486 P.3d

955, *review denied,* 198 Wn.2d 1025 (2021). Unchallenged findings of fact are verities on appeal. *Id.*

   2.   Duty to Preserve Evidence

Zidell Explorations argues that it had no duty to preserve the documents at issue here even though, as the trial court found, the Zidell companies knew by 2002 "that they faced potential liabilities in toxic tort actions." CP at 4625. We agree.

Prior spoliation cases do not provide much guidance regarding the scope of the duty to preserve evidence other than stating that there is no general duty to preserve evidence. *J.K. by Wolf*, 20 Wn. App. 2d at 308; *Cook*, 190 Wn. App. at 463-64, 470. Certainly, an entity may have a duty to "preserve evidence on the eve of litigation." *Homeworks*, 133 Wn. App. at 901. And despite language in *Cook* suggesting a contrary rule, we can assume without deciding that an entity has a duty to preserve evidence relevant to anticipated litigation involving a specific party.[5] Finally, we can assume without deciding that an entity has a duty *under certain circumstances* to preserve evidence relevant to anticipated litigation of the same specific type as the lawsuit in which a spoliation issue arises.

The facts of this case clearly do not fall into either of the first two categories. Zidell Explorations did not destroy the documents on the eve of any litigation and no lawsuit involving Woodruff was anticipated in 2017. Woodruff was not even diagnosed with mesothelioma until August 2020. The question here is whether Zidell Explorations reasonably anticipated in 2017 that it would be sued by a person exposed to asbestos while dismantling a ship.

---

[5] The court in *Cook* relied on two earlier cases in stating that "no duty to preserve evidence arises where a person has been injured by an arguably negligent act and a lawsuit is a possibility." 190 Wn. App. at 463. Although this statement may be true under certain circumstances, we disagree with the statement as a general proposition.

The trial court apparently found a duty based on this third category, suggesting that Zidell Explorations committed spoliation because the documents destroyed in 2017 were "potentially relevant to anticipated future toxic tort litigation." CP at 4632. This conclusion was based on the unchallenged finding of fact that "[b]y 2002, it stood to reason that the Zidell companies knew that they faced potential liabilities in toxic tort actions, and that, given the nature of this type of litigation, that that was going to go on for a long time." CP at 4625-26. The trial court also stated in a conclusion of law that "Zidell knew or should have known that it was going to continue to be involved in litigation arising from its ship dismantling operations – including asbestos litigation." CP at 4632. Zidell Explorations assigned error to that statement.

However, substantial evidence does not support a finding that Zidell Explorations *in 2017* anticipated future litigation by persons exposed to asbestos while dismantling ships at Zidell Dismantling's Tacoma site. Regardless of what Zidell Explorations anticipated in 2002, 15 years had passed by the time the documents were destroyed. During that time, there is no evidence that Zidell Explorations, Zidell Dismantling, or any Zidell entity had been sued or even subject to a workers' compensation claim for asbestos personal injury. And the only asbestos personal injury lawsuit ever filed against any Zidell entity occurred over 20 years before the documents were destroyed. Finally, Silva testified that she was not aware of any litigation or potential litigation at the time the documents were destroyed in 2017.

In 2017, Zidell Explorations at best knew that there was a vague possibility that some lawsuit involving asbestos personal injury might be filed at some unknown time in the future – even though no such lawsuit had been filed in the more than 40 years since Woodruff stopped working at Zidell Dismantling. Woodruff points to no authority suggesting that an entity has a duty to preserve documents under these circumstances. No Washington cases even suggest that

such a duty exists. And adopting a duty in this situation would conflict with the settled rule that there is no general duty to preserve evidence. *J.K. by Wolf*, 20 Wn. App. 2d at 308.

This case is completely different from a situation in which the entity destroying documents has been sued repeatedly regarding certain activities and anticipates that additional lawsuits will be filed in the future. In that situation, the entity would have a duty to preserve relevant documents.

Woodruff relies on the trial court's conclusion that Zidell Explorations "clearly understood that it had a duty to preserve these documents as evidence," relying on Silva's testimony. CP at 4632. Woodruff claims that Silva's testimony is the source of a duty to preserve the documents.

But Silva never testified that Zidell Explorations had a duty to preserve "these documents" – the documents that were destroyed in 2017. She merely testified that she understood that "retention of documents potentially relevant to litigation is a duty that attaches . . . even before a particular piece of litigation is commenced." CP at 2012. Silva did not admit that an entity has a duty to preserve documents simply because they might be relevant to some vaguely possible future litigation. Instead, this testimony is consistent with a potential duty to preserve evidence relating to a specific type of anticipated litigation. But again, Silva testified that there was no litigation or potential litigation at that time.

We conclude on de novo review that Zidell had no duty to preserve the documents destroyed in 2017, and therefore hold that the trial court erred in concluding that Zidell Explorations engaged in spoliation of evidence.

3.  Culpability – Conscious Disregard

Zidell Explorations argues that even if it had a duty to preserve the destroyed documents, the trial court erred in concluding that destroying the documents in 2017 involved a culpable state of mind and a conscious disregard of the obligation to preserve the documents. We agree.

The trial court made the following conclusion of law:

> Because Zidell knew or should have known that it was going to continue to be involved in litigation arising from its ship dismantling operations – including asbestos litigation – yet did not take the very simple step of digitizing those documents before they were destroyed, the Court concludes that there was a culpable state of mind and a *conscious disregard of Zidell's legal obligation to preserve documents* reasonably anticipated to be relevant in future litigation.

CP at 4632 (emphasis added). As noted above, culpability in the spoliation context involves acting in bad faith or with a conscious disregard of the *significance of the evidence* as opposed to having an innocent explanation for the destruction. *Carroll*, 22 Wn. App. 2d at 875. And the rule is that " 'a party's negligent failure to preserve evidence relevant to foreseeable litigation is not sanctionable spoliation.' " *Id.* (quoting *Cook*, 190 Wn. App. at 464).

Even if records containing ship ownership information were included in the destroyed documents,[6] the same facts discussed above regarding duty show that Zidell Explorations acted negligently as opposed to in bad faith or with a conscious disregard of the significance of the evidence. There is no indication that Zidell Explorations destroyed the documents in order to avoid future liability or to strengthen its position in future litigation. Zidell Explorations had never been sued regarding asbestos exposure at Zidell Dismantling's facility (or its facility), and the only asbestos-related lawsuit involving a Zidell entity had been filed over 20 years earlier.

---

[6] Zidell Explorations argues that there is no evidence that ship ownership information was contained in the destroyed documents, and therefore there is no indication that the destroyed documents were important or relevant in this case. Because we reverse on other grounds, we do not address this argument.

Although the trial court found that there was a potential for toxic tort lawsuits in the future, there was only a vague possibility of such lawsuits. And Silva testified that there was no litigation or potential litigation when the documents were destroyed. At worst, the destruction of the documents was negligent.

In *Cook*, Division Three of this court reversed a finding of spoliation when the plaintiff destroyed significant evidence even though litigation was anticipated. 190 Wn. App. at 470. In that case, the plaintiff was badly injured in a vehicle accident and retained a lawyer to explore the possibility of a lawsuit. *Id.* at 452-53. The plaintiff's lawyer and an expert examined the vehicle the plaintiff was driving. *Id.* at 453. The plaintiff then parted out and sold the vehicle without removing the event data recorder, which could have provided information about the vehicle's speed at the time of the accident. *Id.* at 452, 454. The trial court concluded that the plaintiff had breached a duty to retain the vehicle, and as a sanction excluded the expert who had examined the vehicle from testifying about speed. *Id.* at 455-56. Division Three reversed, holding that there was no spoliation because the plaintiff's destruction of the vehicle was "merely negligent." *Id.* at 470.

The facts of this case are even more supportive of a finding of mere negligence. In *Cook*, specific litigation clearly was anticipated by the party destroying the evidence – the plaintiff had retained a lawyer and an expert. Here, there was only a vague possibility of some future, unknown lawsuit.

The trial court here also based its culpability conclusion on the fact that Zidell Explorations did not digitize the documents before destroying them. The court took judicial notice of the fact that in 2017 "the common course of business for most corporations in the country would be to digitize historic business records prior to their destructions." CP at 4627.

Zidell Explorations argues that the trial court erred in taking judicial notice of this fact. Although we are skeptical that this fact is the proper subject of judicial notice, we need not address this issue. For the reasons stated above, there is no indication that the failure to digitize the documents involved an attempt to avoid future liability as opposed to mere negligence.

We conclude that there is no evidence that Zidell Explorations' destruction of the documents in 2017 involved bad faith or conscious disregard of the significance of the evidence. Therefore, even under an abuse of discretion standard, we hold that the trial court erred in concluding that Zidell Explorations acted with culpability and that Zidell Explorations engaged in spoliation of evidence.

## CONCLUSION

We remand for the trial court to vacate the judgment entered against Zidell Explorations and for a new trial.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
MAXA, J.

We concur:

_____
GLASGOW, C.J.

_____
CRUSER, J.